250 So.2d 754

Emile M. WEBER, Individually, etc., et al., Plaintiffs-Appellees-Relators,

v.

FIDELITY & CASUALTY INSURANCE COMPANY OF NEW YORK et al., Defendants-Appellants-Respondents.

No. 50779.

June 28, 1971.

Rehearing Denied Aug. 12, 1971.

John T. Caskey, Jr., Baton Rouge, for plaintiffs-appellees-relators.

Breazeale, Sachse & Wilson, Henry D. Salassi, Jr., Baton Rouge, for defendants-appellants-respondents.

TATE, Justice.

A customer claims damages from the manufacturer of cattle dip and its insurer. The dip had been bought from a local supplier, no longer a party. Application of the dip caused seven of the plaintiff's son's cattle to die shortly thereafter, and his two then-minor boys to become ill.

The court of appeal reversed a trial court judgment in favor of the plaintiff and his sons, now majors. 236 So.2d 616 (La. App. 1st Cir. 1970). We granted certiorari, 256 La. 848, 239 So.2d 356 (1970), to review the plaintiffs' substantial contention that the court of appeal incorrectly denied recovery for damages resulting from the use of the manufacturer's product. The issue is whether the intermediate court erred in reversing the trial determination that the cattle dip was defective.

Both previous courts correctly found applicable the following legal principles:

A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might

reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i. e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect.

See: Penn v. Inferno Manufacturing Co., 199 So.2d 210 (La.App. 1st Cir. 1967), cert. .denied 251 La. 27, 202 So.2d 649 (1967); Arnold v. United States Rubber Co., 199 So.2d 210 (La.App. 1st Cir. 1967), cert. denied 251 La. 739, 206 So.2d 91 (1968); Meche v. Farmers Drier & Storage Co., .193 So.2d 807 (La.App. 3d Cir. 1967), cert. denied 250 La. 369, 195 So.2d 644 .(1967); Samaha v. Southern Rambler Sales, Inc., 146 So.2d 29 (La.App. 4th Cir. 1962); Percy, Products Liability, 40 Tul.L.Rev. 715 (1967); Note, 26 La.L.Rev. 447 (1966). See also: Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049 (1963), Noted, 23 La.L.Rev. 810 (1963); Henningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69 (1960); Annotation, Products Liability, 13 A.L.R.3d 1957 (1967).

 If the product is proven defective by 'reason of its hazard to normal use, the plaintiff need not prove any particular negligence' by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them.

See: Radalec, Incorporated v. Automatic Firing Corp., 228 La. 116, 81 So.2d 830 (1955); Tuminello v. Mawby, 220 La. 733, 57 So.2d 666 (1952); Doyle v. Fuerst & Kraemer, 129 La. ˙ 838, 56 So. 906, 40 L.R.A.,N.S., 480 (1911); George v. Shreveport Cotton Oil Co., 114 La. 498, 38 So. 432 (1905); Penn v. Inferno Mfg. Co., 199 So. 2d 210, 230 (La.App. 1st Cir. 1967), cert. denied 251 La. 27, 202 So.2d 649 (1967).

In the present instance, as the previous courts found, the evidence clearly proves a causal relationship between the injuries sustained and the use of the product. The evidence shows that, as found by both of the previous courts, the seven cattle died, shortly after spraying, because of excessive amounts of arsenic in the spray solution containing the defendant's cattle dip product. Further, the plaintiff's two then-minor boys doing the spraying also became nauseated as the result of arsenical poisoning, due to such excessive arsenic.

The chief factual issue remains whether the excessive amount of arsenic in the spray solution resulted from a defective batch of the defendant's dip or was, instead, the result of improper mixture by the boys, then aged 17 and 15 years. (Since the product was purchased in a sealed container and not opened until immediately before use, no issue is now raised as to other intervening or contributing fault.)

The defendant manufacturer's dip is shown to be an inherently dangerous and

deadly product due to its arsenic content (15–20% by weight or volume). However, if properly mixed with water in a ratio of not more than 1 to 127, the dip (if manufactured according to specifications) is not dangerous to cattle and is effective in preventing insect infestation.

The dip was purchased in a five-gallon container. It was used on the afternoon of August 31, 1963. The plaintiff's son testified that he filled one coffee cup (6–8 ounces) with dip. He added this to a 20-gallon drum of water. The evidence shows this to be in a ratio of 1 to 200 or 1 to 235, well within safe limits.

The two brothers commenced spraying the cattle. Approximately an hour later, after they had sprayed seven cattle, signs of distress began to appear in the sprayed animals. They were staggering, falling and going into convulsions. One had died within an hour or so of the spraying and the remainder by the following morning.

Immediately after the incident of August 31, 1963, the plaintiff father buried the dead cattle, the unused cattle dip, and the mixing cup, for fear of further contamination. (By the time of trial in 1969, the site had been covered by highway construction.) The father verified, however, that, when he was called by his boys due to the distress of the cattle, only a trace of dip had been removed from the almost-full five-gallon container.

The evidence of the defendant's experts shows that the cattle could not have been poisoned by absorption of excessive arsenic, if the dip were mixed with water at the approved or a lesser ratio (such as that to which testified by the plaintiffs)—*and if, indeed, the dip in the container contained only the proportion of arsenic specified by the manufacturer.*

That is, to counter this proof of·injury following use of the product substantially in accord with directions, the defendants produced two experts to show, on a hypothetical basis, that the cattle could not ·die if the product was properly used and *if the sample of the product used contained· arsenic only in accordance with the intended specifications.* This, of course, assumes the very issue before us. The evidence is relevant to its determination but not decisive of it, the issue being: Whether (as the experts *assumed*) the portion of the· product in the plaintiffs' possession indeed, did contain arsenic *only* in the amount of` the specifications.

The dip itself was prepared for a usual .use in large-scale governmental programs. However, it was also offered for sale in small-scale operations, such as the present.

One of the defendants' experts, for instance, was a veterinarian who usually used the product in large dipping vats containing 1500 gallons or so. The dipping solution was then used only after testing, since (as the expert testified) "any arseni-

cal preparation is a dangerous product". The expert noted that the product with its specified arsenical content would not kill cattle if used properly and in accordance with the directions on the label.

The other expert testifying for the defendants was the veterinary director of the dip manufacturer. He explained the usual rigorous testing procedures used to assure compliance with specifications with governmental standards, noting that tests were conducted on a sample from each 2700-gallon batch manufactured. He stated, however, that no record could be found of the batch from which the present container was filled at the time of manufacture in 1963, since the records were kept only for three years. (Suit was filed against the defendant manufacturer in 1964.) The director stated that he had no record of any inadequacy of the 1963 batch nor of any complaints arising from its use. (He had not entered the manufacturer's employ until 1965.)

In evaluating the evidence, the trial court accepted as truthful the testimony of the plaintiffs that they had used only a small proportion of the dip, well within safe limits, in preparing the spray solution.

If such testimony is correct, then the plaintiff's sons had applied the dip substantially in accordance with the manufacturer's directions. The plaintiff's son had stirred the mixture thoroughly. Although it was a hot day, there is no evidence that the cattle were heated or had been run.

Under these circumstances, by reason of the trial court's evaluation of the testimony of the plaintiffs as truthful and credible, the plaintiff has made out at least a prima facie case that the cause of the cattle's death and of his boys' sickness was excessive arsenic in the batch of the manufacturer's dip purchased by them: For, if the plaintiff's sons had prepared the spraying-solution in the manner described, the cattle would not have died from such normal spraying, *if* the dip had contained *only* the normal amount of arsenic. Under these circumstances, the most reasonable hypothesis for the cause of the cattle's death is an excessive amount of arsenic in the portion of the dip received from the manufacturer; for otherwise the cattle would not have died.

In this civil case, the plaintiffs' burden is to prove causation by a preponderance of the evidence. This burden may be met either by direct or, as in this case, by circumstantial evidence. Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971); Naquin v. Marquette Cas. Co., 244 La. 569, 153 So.2d 395 (1963).

As we stated in the latter decision, 153 So.2d 397: "Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other *possible* causes. Otherwise, the mere identification by the record of another possibility, although not shown

to be causally active, would break the chain of causation."

■ In the present case, the plaintiffs have met this burden by evidence found credible by the trier of fact. They have showed that the dip was used as the manufacturer must reasonably have anticipated, that it killed the cattle, and that the most probable reason it killed the cattle was an excessive amount of arsenic in the small portion of the dip utilized to prepare the spray solution.

The defendants have not produced evidence that the portion of the dangerous dip was manufactured properly. The manufacturer did not produce evidence that the batch of the dip had contained the proper proportion of arsenic, although, of course, its witnesses do testify that the cattle should not have died if the spraying-mixture was properly prepared (*if* the dip contained only the arsenic of the specifications).

We might briefly dispose of the intimations of fault offered by the defendant: That the solution was stirred with a stick instead of with a plunger and that the cup of dip *may* have been poured into the can before, instead of after, the 19–20 gallons of water, is immaterial in view of all the evidence. The solution was thoroughly stirred before being applied. All seven cattle died through the use of almost all of the 20-gallon spray mixture: (That is, if improper mixture had caused an unusually heavy concentration of arsenic in one portion of the 20-gallon mixture, then only the cow or so on which this concentrated portion of the spray had been used would have been affected, not each and every one of them.)

Likewise, the suggestion that untoward effects were produced by the spraying being done on a hot August day is not impressive. It is based upon one of the numerous directions [1] as to use of the product, designed (according to its wording) to avoid "a burning of the skin". Nothing on the label indicated that the cows will die if sprayed on such a day.

There is further no evidence that the cattle were tired or unduly heated before spraying. The boys, on foot, drove the cows from a ten acre pasture to a holding

---

1. The label direction in question is as follows: "It is very necessary to rest and water cattle before dipping or spraying. Cattle should be rested in a shady place following dipping or spraying and never driven immediately after treatment. Cooper's Cattle Dip is a very reliable product and will give excellent results, but if cattle are heated or tired there is liability of burning. Dip or spray early in the day to assure cattle drying thoroughly before nightfall—this is especially important on cloudy or muggy days. Carelessness in this respect may result in serious loss."

The evidence shows that the reason for watering cattle is that, when a dipping vat is used and the cattle are thirsty, they may drink from the dipping vat. The evidence does not show that, if the dip had contained only the specified concentration of arsenic, the application of it to cattle on a hot day would have caused serious effects.

pen. Then the cows were brought, one at a time, from the pen to the shed where they were sprayed in the shade, then released to another small pasture with shade trees and a water trough.

■■■■ Since the plaintiffs have established by circumstantial evidence that the most probable cause of their damages was the improper arsenic proportions and preparation of the dip by the manufacturer, we affirm the trial court's finding that the plaintiff has proved liability by a preponderance of the evidence. The record likewise justifies the trial court's award of damages ($2,650 for loss of the animals, $360 for veterinary and medical expenses, $100 to each boy as compensation for very temporary nausea and physical distress).

Accordingly, for the reasons assigned, we reverse the judgment of the court of appeal which dismissed this suit, and we reinstate and affirm the judgment of the trial court awarding the plaintiffs damages in the amounts shown, with legal interest. All costs of these proceedings are assessed against the defendants-appellants-respondents.

Court of Appeal judgment set aside, trial court judgment reinstated and affirmed.

HAMLIN, Justice (dissenting).

I definitely do not find that plaintiffs have established by circumstantial evidence that the most probable cause of their damages was the improper arsenic preparation of Cooper Cattle Dip by the manufacturer, as found by the majority opinion. I also find that the expert testimony discloses that the cattle died from arsenic *absorption*. I do not find that plaintiffs have borne their burden of proving that the Cooper Cattle Dip employed by Steve Weber to spray his cows was defective and that plaintiffs' damages were caused by reason of the defect. I find that the instructions set forth on the bottled dip with respect to spraying were not observed by Steve Weber and that the cattle were not sprayed properly. For the reasons set forth infra, I believe that the judgment of the Court of Appeal should be affirmed.

The Court of Appeal 236 So.2d 616 correctly states the facts leading to the filing of the suit as follows:

"The record discloses that Steve Weber was approximately 17 years of age at the time of the incident in question. For some four or five years he had been engaged in raising cattle as part of a 4–H Club Project. His endeavors had produced a herd of approximately 12 cattle, some of which had won honors in stock shows. On the afternoon of August 31, 1963, he decided to spray his cattle to rid them of flies, known as cattle grubs, which lay eggs on cattle. The eggs apparently produce worms which enter the bodies of cattle causing large holes to appear in the animal's back.

"To accommodate his son Steve, the senior Weber maintained a charge ac-

count with Kalmbach-Burkett, a distributor of livestock feed and supplies. It appears that Steve had virtually unlimited authority to purchase from this source such feed and supplies as his cattle project required. Approximately four to five months prior to the incident in question, young Weber placed a telephone order with the distributor for a cattle spray in anticipation of spraying his herd on some future occasion. He did not, however, specify either the type of spray desired or the number of cattle to be sprayed. The employees of the distributor filled the order by depositing a five gallon can of Cooper's Cattle Dip on its loading dock where it was picked up by young Weber after the distributor had closed for the day. The container of dip was brought to the plaintiffs' ranch home and stored in a barn or similar facility somewhat removed from the family residence.

"The evidence discloses beyond doubt that the afternoon on which the spraying occurred was an extremely hot day. Steve Weber, assisted by his younger brother, Karl, on foot rounded up the cattle from a pasture measuring approximately 10 acres in area. The animals were thusly herded into a pen near a shed or barn. They were then led singly by a rope halter from the pen to a shed where they were tied to a post and sprayed one at a time. After spraying, they were let out to pasture. Each animal was sprayed over its entire body, including its head. After the seventh or eighth animal was treated, signs of distress began to appear in that the sprayed animals staggered, fell and went into convulsions. The spraying operation was ceased immediately. The Senior Weber was summoned and in turn he enlisted the aid of a veterinarian. When the boys complained of dizziness, nausea and feeling faint, Mr. Weber immediately took them to a physician. The veterinarian worked the remainder of the afternoon and through the night attempting, without success, to save the animals that had been sprayed.

" * * *

"Mr. Weber's testimony [this testimony is not contradicted] is substantially that when summoned to the scene, he found the cattle staggering or lying down in convulsions. He examined the can containing the concentrated dip and observed that so little was missing, it was difficult to tell whether any had been used. He also examined the garbage can in which the solution was mixed and found only two or three inches of mixture left in the bottom of the can. He summoned a veterinarian to attend the animals. When his sons complained of headaches and nausea, he immediately sought medical advice. [The boys' discomfort was of short duration; they were taken to a physician but received no treatment.] Fearful of the arsenic in the compound, a day

or two following the incident, he caused the remainder of the cattle dip, the garbage pail, the cup used for measuring, the stick with which the mixture was stirred and the carcasses of the animals to be buried. A freeway, having since been erected over the site, neither the dip nor the carcasses of the animals were available for further examination."

On August 11, 1964, Emile M. Weber, individually and for and on behalf of his minor sons, Karl and Steve,[1] filed suit against William Cooper & Nephews, Inc., manufacturers of Cooper Cattle Dip, and its insurer, Fidelity & Casualty Insurance Co. of N.Y., and Kalmbach-Burkett Company, Inc., distributor of Cooper Cattle Dip, and its insurer, Standard Accident Insurance Company. He alleged that the manufacturer was negligent in wantonly and negligently supplying material to the gen-

eral public containing an extremely high arsenic content without cautioning its distributors against allowing minors and anyone other than veterinarians to use the solution; he further alleged that the distributor was negligent in selling Cooper Cattle Dip to his sons. He prayed for damages in the sum of $4,800.00.[2]

After trial on the merits, the trial court rendered judgment jointly and in solido against William Cooper & Nephews, Inc. and Fidelity & Casualty Insurance Co. of N.Y., and in favor of plaintiffs, Steve Weber in the amount of $2,750.00, Karl Weber in the amount of $100.00, and Emile Weber in the amount of $360.00, all amounts bearing legal interest from August 11, 1964, until paid. Judgment was rendered in favor of defendants Kalmbach-Burkett Company, Inc. and Standard Accident Insurance Company.[3]

---

1. At the time of trial, the two boys were majors and were made parties to the suit.

2. The damages were itemized as follows:

| | |
|---|---:|
| 1 Registered Hereford Cow | $ 300.00 |
| 1 Registered Hereford Cow | 1,000.00 |
| 1 Registered Hereford Bull | 1,000.00 |
| 2 Jersey Milk Cows | 600.00 |
| 1 Holstein Milk Cow | 300.00 |
| 1 Brahma Cow | 250.00 |
| Veterinarian's Bill | 350.00 |
| Discomfort and anxiety suffered by boys | 1,000.00 |

3. The trial court stated in its reasons for judgment: "In view of the fact that the cattle had previously been healthy prior to the administration of the spray, the

Court cannot come to any other conclusion other than that the product used was the offending cause of the animals' death. Furthermore, the Court is of the opinion that the label on the Cooper's product sufficiently warns the public insofar as the dangerous properties of the compound. Since the evidence reflects a substantial adherence by Steve Weber to the directions shown on the label (KB–1) for the preparation of the solution, it appears a definite and strong probability that the compound was improperly prepared and produced by the manufacturers, William Cooper and Nephews, Incorporated. While other possibilities certainly exist and may not be excluded in any reasonable review of the situation, the circumstantial evidence in the case is sufficient to warrant a finding of liability on the part of the manufacturers."

As stated supra, the Court of Appeal reversed the judgment of the trial court, stating: "Since the record establishes that the animals died of arsenic poisoning and plaintiff has offered no proof whatsoever that defendant's product was defective, only two conclusions appear plausible. Either Steve Weber mixed the concentrate stronger than he recalled or his carelessness in not following defendant's express instructions resulted in the 'serious loss' of which defendant's label expressly warned. Because the cattle became distressed within such a short time following their spraying, we are inclined to the view that notwithstanding young Weber's testimony to the contrary, he probably either put too much dip in the quantity of water used or did not properly mix and stir the solution. Whatever may have been the cause of the loss, plaintiff has failed to establish negligence on defendant's part."

In this Court, plaintiffs assign the following errors to the judgment of the Court of Appeal:

1. The Court erred in reversing the judgment of the trial court without finding manifest error when the judgment of the trial court was based on a preponderance of the evidence.

2. The Court erred in overturning the finding of fact of the trial court that the cattle died from arsenic poisoning and that the product was the cause of the animals' death.

3. The Court substituted its own finding of fact for the finding of the trial court which was based upon the preponderance of the evidence.

Plaintiffs contend that this matter should be determined according to strict liability in product cases. They argue that there is no sound reason why the principle of manufacturer's liability should not be extended to a case such as the instant one.

Defendants submit that no negligence was shown on the part of William Cooper & Nephews, Inc. They urge that no fault on their part can be inferred since there was no showing that the product was defective, unwholesome or dangerous when used for its intended purposes as directed. They further urge that no fault can be inferred when there is no showing that the manufacturer failed to warn the user of danger. They contend that liability should not attach simply because the product was dangerous without a showing of a failure to warn or instruct of hazards.

The container of Cooper Cattle Dip displayed a large yellow label, and the detailed instructions, printed thereon in black ink, recited:

VON-LN FILED IN EVIDENCE

## Look for the Red Circle

Exhibit __143 - 1__
Date __9 Sept 1969__
Kathleen Poe
Deputy Clerk

# Cooper Cattle Dip

# For Destroying Ticks and Biting Lice on Cattle, Horses, Mules and all Large Stock

*Its use permitted in all Official Dippings of Cattle affected with Ticks*

## Directions for Use

For all Official Dippings in interstate movement of live stock, add one gallon of Dip to every 177 gallons of water. For ranch use and other than official dipping, a dilution of one gallon of Cooper's Cattle Dip to 155 gallons of water will be found very effective. Always pour dip straight into the water and mix thoroughly with a plunger. There should be no previous mixing.

The stirring should be very thoroughly done this is important—Cooper's Cattle Dip dissolves readily but to be sure it is thoroughly mixed, proper attention must be given to this first stirring. Subsequent mediate stirring is necessary, as subsequent terms in the mixed wash. Wash out carefully before the entire contents being used. In making the solution don't guess at the quantities of either water or Dip.

It is important that the Dip and water be accurately measured and the proper strength always maintained. This can be done with a Cooper's Cattle Dip Testing Outfit.

If mixed dip has stood several months, it should not be used—clean out dipping vat and start with fresh dip. Old mixed dip oxidizes in the vat and is

stronger than the Testing Outfit indicates. This may cause burning.

Cooper's Cattle Dip is effective when applied as a spray—however, spraying should always be carefully done—never spray cattle bunched in a pen—treat each animal individually in a chute.

Never rub dip on to skin—this is dangerous.

It is very necessary to rest and water cattle before dipping or spraying. Cattle should be rested in a shady place following dipping or spraying and never driven immediately after treatment. Cooper's Cattle Dip is a very reliable product and will give excellent results, but if cattle are heated or tired there is liability of burning. Dip or spray early in the day to assure cattle drying thoroughly before nightfall—this is especially important on cloudy or muggy days. Carelessness in this respect may result in serious loss.

Repeated Dipping or Spraying — If a second dipping or spraying is carried on in the interstate movement of live stock, an interval of not less than seven days after the first should be allowed.

## OUR GUARANTEE

### To the U. S. Department of Agriculture

Permission for the use of this product in the Official Dipping of Cattle for Ticks has been issued by the United States Department of Agriculture. We guarantee the contents of this package to be of the same composition as the sample we submitted to the Department for examination, and that when diluted according to the directions printed hereon for the treatment of cattle for ticks, it will produce solutions of the composition required for arsenical dipping baths by the regulations of the Secretary of Agriculture, relative to Splenitic or Texas Fever.

## WARRANTY

William Cooper & Nephews, Inc. warrant Cooper Cattle Dip will control animal parasites and insect pests names on label if used as directed, or it will refund purchase price upon delivery of container with unused contents to dealer. No other warranty is made, either express or implied. Cooper Cattle Dip is sold with the distinct understanding by the buyer that he will not hold either William Cooper & Nephews, Inc. or the seller liable for any consequences from use of Cooper Cattle Dip, regardless whether or not used as directed. If buyer is unwilling to use this product on these terms and solely at his own risk, the buyer must return this container unopened and in good condition to dealer for refund. Any buyer failing to return container shall be presumed to have accepted the terms of this notice.

ACTIVE INGREDIENTS — *Arsenic Trioxide* ................... 20.00%
 Soap ...... ..................... ... 10.25%
 Cresylic Acid ........... .......... 8.50%
INERT INGREDIENT—*Water not exceeding 50%.*
ARSENIC—*15.15% Calculated as metallic Arsenic, all in water soluble form.*
5 GALLONS U. S. MEASURE

# WILLIAM COOPER & NEPHEWS
INCORPORATED
1909-25 CLIFTON AVE. CHICAGO, U. S. A.

## CAUTION POISON

*Cooper's* Cattle Dip is a poisonous preparation and must be used in accordance with directions. Never increase the strength. *Cooper's* Cattle Dip will fulfill claims made for it at the strength designated ANTIDOTE—Emetic of mustard (1 tablespoonful to cupful of warm water); hydrated oxide of iron and magnesia, a cupful; follow with olive oil or white of eggs, mucilaginous drinks; thirty grains potassium bromide in water. If much pain, give two teaspoonfuls paregoric in water. Have patient lie down and keep warm. Call physician immediately.
CAUTION—Keep away from children, pets and food stuffs. Avoid excessive skin contact and wash off thoroughly after exposure. If on clothing, remove and wash. Avoid inhalation and spray mist. Skin absorption or swallowing may be fatal to livestock. Rinse empty containers several times with water. Perforate or break, and bury containers, never re-use. —0—

[172Z]

After reading the testimony of record, I find as a fact that plaintiffs' cows died from arsenic poisoning. Since the carcasses of the animals were destroyed before examination, I cannot determine whether they died from inhalation or absorption. Dr. C. M. Heflin, veterinarian, a witness for defendants, testified that in order to kill a cow in an hour or less, ten times the ordinary recommended strength of the instant product would be required; that either oral or dermal application would be fatal if the product employed were to strong. He further stated that if a cow has an overdose of spraying, it becomes nervous and paralytic and then falls down; that it might have some rigors, and that when it lies down it cannot get up. He surmised that the absorption of arsenic paralyzes the heart action. With respect to taking the product orally, he said: "Of course, if it is taken orally it is stored in the liver and it can be detected by examining the liver because it is stored in the liver, the poisoning by the mouth. Of course, if you get an overdose dermally on the skin, why, it is absorbed so fast it just kills pretty quickly." Dr. Heflin testified that he was familiar with Cooper Cattle Dip, and "I have had to do with it and used it for the last over forty years." He had treated thousands of cows with the product, and none had died of arsenic poisoning as a result of his treatment. He further said, "All I could say is that if the preparation known as Cooper's Cattle Dip or any other arsenical dip is used in compliance or according to the directions it is not going to kill cattle or horses or mules either."

Steve A. Weber, twenty-four years of age at the time of trial and a Deputy Sheriff for the Parish of East Baton Rouge, testified with respect to his mixing the solution on the day of this fatal incident. He said that he sprayed the cattle in the stable area—about fifty yards from where the solution was mixed; that the mixture was applied with "a gasoline driven sprayer that has two hose attachments, one for suction and the other for spraying and you press the suction hose into the solution to be sprayed and it causes suction and shoots it out and you spray." He could not remember the adjustment used on the spray. He said that he had never used the spray which was employed for a pesticide spraying of flowers; that the hose was five or six feet long, but that he did not know how far it went into the garbage can; that he did not clean the spray before he used it. Steve remembered that the weather was fair and hot on the afternoon of the spraying; this fact is confirmed in the testimony of Dr. Martin L. Levy who observed the Weber boys after the spraying. When asked what was done with the cows before spraying, Steve stated: "We had them in a large pen and we would single one out and rope it and bring it over to the stable area. The pen adjoining the stable

area was where we kept them and we just tied them under—there is a—the stables have a shed that goes out and there is a walkway and we tied them there under the walkway and sprayed them." The cows were tied to a post and sprayed one at a time; when the spraying of a cow was completed, it was turned out into pasture. When asked how the cows reacted to being sprayed, Steve said: "Well, they struggled a little bit specially when you would shoot it up around the head. They didn't particularly care for that." He said that the cows were sprayed all over—head and all. Seven or eight cows had been sprayed when Steve realized something was wrong and summoned his father. When asked how long it was from the time that the cattle were sprayed and the time they died, Steve responded, "I would say between twelve and—ten or twelve hours because when we went to bed that night there was one of them I believe were still alive and it must have either the next morning or—"

Dr. M. C. Helouin, veterinarian who treated the Weber cows after they were sprayed, was called as a witness for plaintiffs. He testified that he had never used Cooper Cattle Dip because it is dangerous; that he does not like it on that account, and that in his opinion there are safer products on the market. He testified that from the symptoms· displayed by the cows, their deaths were caused ·by arsenic poisoning.

Dr. Paul Christofferson, Veterinary· Director at William Cooper & Nephews, Inc. at time of trial, being in charge of research and development and quality control, was called as a witness for defendants. He testified that since 1948 there had been no ·rejections of Cooper Cattle Dip. He ·was asked: "Were you able—this suit as you know arises from an incident which occurred back in 1963 when some of this dip was used and the cattle died. Were you able to ascertain from the records of the company the particular batch? Were you able to trace a batch to the plaintiff in this case?" He responded: "No. Our records, our samples are kept—were kept at that time for three years and the first notification I had was in I believe April of 1968, some five years apparently after the material was bought or used, and we went back as soon as I received notification, went back through the files to see if we had had any prior complaints and also went back into our quality control storage laboratory and we could find no such samples and we could find no such complaints either." ·He said that the reason for resting and watering cattle before dipping or spraying was "because frequently experience has shown that thirsty cattle would tend to drink water containing arsenic or the dip or the ·spray, wherever puddled in a foot print or wherever, and thus take it in, also, if the animals are overheated through exercise or through extremely hot weather or other--

wise they tend to have a higher rate of absorption because the vessels of the skin are dilated. This then would tend to allow more absorption and thus more chance for toxicity." Dr. Christofferson gave the following explanation of the methods employed by his company to insure the uniformity and proper manufacture of Cooper Cattle Dip: "This particular product must conform to rather rigid quality specifications. First, because of the inherent toxicity of the product itself, that is, the arsenic it contains, second, because it is called a permitted dip, that is, it is permitted by the United States Department of Agriculture to be used in disease eradication programs and as such must then meet their specifications which the Department sets. In addition, of course, we have our regular routine quality procedures for manufacture. These must show that we avoid contamination of this product with others and avoid contamination of other products with this particular product. It is manufactured under set specifications in particular vessels and the procedure is, of course, written out for those to follow who formulate the material. The raw ingredients are tested as they enter the lab. Upon approval they can then be used in the manufacturing area under proper precautions. Then when the product is finished in each batch samples are taken to a laboratory for testing before it can be packaged or before the containers can be filled for marketing." He said that

the dip is used on the border between Texas and Mexico for tick eradication. Eighty percent of the company's production is purchased by the United States Government, and every batch the Government buys is subject to its analysis and to conformance to its specifications. The product is only manufactured when there are Government or State orders.

Restatement, Second, Torts, Sec. 402 A., p. 347, Special Liability of Seller of Product for Physical Harm to User or Consumer, recites:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

Comments under Section 402 A., supra, recite:

"(g) *Defective condition.* The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him. The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed. The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained."

There are some unavoidably unsafe products. Comment (k.) states in part, "The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and undesirable product, attended with a known but apparently reasonable risk." See, 13 A.L.R.3d pp. 1049–1103; Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897; Estabrook v. J. C. Penney Company, 105 Ariz. 302, 464 P. 2d 325; Larsen v. General Motors Corporation, 8 Cir., 391 F.2d 495; Schenfeld v. Norton Company, 10 Cir., 391 F.2d 420.

Plaintiffs contend that the Restatement of Torts, supra, is exactly in point with the instant case. They argue that the findings of the trial judge, supra, support their contention.

Louisiana has not as yet incorporated the Restatement of Torts, supra, as such into its jurisprudence. See, 26 La.L.Rev. p. 447. Cf. Evans v. Travelers Insurance Company, La.App., 212 So.2d 506; Arnold v. United States Rubber Company, La.App., 203 So.2d 764; Larance v. FMC Corporation, La. App., 192 So.2d 628.

"The doctrine of res ipsa loquitur is a rule of evidence, the applicability of which is determined in each instance at the conclusion of the trial. When applicable, it makes out a prima facie case of negligence on defendant's part and shifts the onus on defendant to show an absence of negligence. The doctrine of res ipsa loquitur, being a qualification of the general rule that negligence is not presumed but must always be affirmatively established, should be sparingly applied only in exceptional cases where the demands of justice make its application essential. Day v. National United States Radiator Corporation, 241 La. 288, 128 So.2d 660.

"It is settled in our law that the doctrine of res ipsa loquitur applies only when the instrumentality alleged to have caused the damage is in the actual or constructive control of the defendant, or where plaintiff has proved freedom of fault on the part of all through whose hands the instrumentality passed after leaving defendant. Eversmeyer v. Chrysler Corp., La.App., 192 So.2d 845; Brechtel v. Gulf States Elevator Corp., La.App., 195 So.2d 403; West v. Hydro-Test, Inc., La.App., 196 So.2d 598." Lutheran Church of Good Shepherd v. Canfield, 233 So.2d 331, 339, writ refused, 256 La. 360, 236 So.2d 497 (1970).

"Causation may, of course, be proved by circumstantial evidence. In many instances, it can be proved only by such evidence. Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other *possible* causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation." Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395. See, Lambert v. State Farm Mutual Automobile Ins. Co., La.App., 184 So.2d 107; Saucier v. Aetna Casualty & Surety Co., La.App., 217 So.2d 451.

From a study of the facts and evidence of record, I conclude that despite what doctrine might be herein invoked—negligence, res ipsa loquitur, or even Restatement of Torts—plaintiffs have not made out a case of negligence on the part of William Cooper & Nephews, Inc. They offered neither definite nor preponderating proof that the instant Cooper Cattle Dip was defective when it left the seller's hands, when it was received, or when it was mixed with the twenty gallons of water used by Steve Weber. Their testimony with respect to the Cooper Cattle Dip does not exclude other hypotheses of causation of the death of the cattle.

By their testimony, supra, plaintiffs admit that the spray was administered on a hot day (the instructions, supra, warn against heat) by a gasoline driven sprayer; that after administration, the cattle were not kept in a cool place—they were turned out to pasture. The cattle were not meticulously watered before administration of the spray (the instructions, supra, provide for the watering of cattle before administration of Cooper Cattle Dip). Steve Weber's testimony with respect to the actual spraying is that he covered the animals with the solution; that he took no precautions regarding inhalation or absorption. His testimony reflects that he was not familiar with the operation of the gasoline driven sprayer employed by him. I conclude that the testimony of Steve Weber

and other witnesses—particularly that of Karl Weber who assisted his brother with the cattle—does not preclude the hypothesis that the instant spray was or might have been improperly applied.

Defendants' testimony, supra, preponderates to the effect that the instant dangerous Cooper Cattle Dip was not defective. The warning, supra, is strong and would alert any reasonable user to the dangerous propensities of Cooper Cattle Dip and the risks of application.

I conclude that although the death of the cattle was tragic, plaintiffs have not borne their burden of proof; they are not entitled to damages for the deaths. In an understandable moment of fear, the evidence was buried and, unfortunately, later destroyed. This case therefore rests on probabilities and hypotheses which I find preponderate in favor of defendants.

I respectfully dissent.

McCALEB, J., dissents being in accord with the views expressed by HAMLIN, J.