374 So.2d 1269 (1979)
HARTFORD FIRE INSURANCE COMPANY, Plaintiff-Appellee,
v.
The MAYTAG COMPANY, Defendant-Appellant.
No. 7097.
Court of Appeal of Louisiana, Third Circuit.
August 30, 1979.
Scofield, Bergstedt & Gerard, John B. Scofield, Lake Charles, for defendant-appellant.
Mouton & Jeansonne, David S. Cook, Lafayette, for plaintiff-appellee.
A. Bruce Rozas, Mamou, for defendant-appellee.
Before SWIFT, STOKER and DOUCET, JJ.
DOUCET, Judge.
This suit was brought as the result of a fire which took place in the home of Mr. and Mrs. Bertram Duplechain on the night of April 17, 1976, or in the early morning hours of April 18, 1976. The fire was alleged to have been caused by a defective *1270 clothes dryer manufactured by The Maytag Company, the defendant-appellant in this suit, and purchased by the Duplechains from Home Discount Center about seventeen months prior to the fire.
Hartford Fire Insurance Company, the Duplechains' insurer and the plaintiff-appellee, paid the Duplechains $8,148.02, which was stipulated to be the amount of the damage to their home, and brought this subrogation suit against Maytag and Home Discount Center. After a trial on the merits, the district court rendered judgment in favor of Hartford and against Maytag, awarding Hartford $8,148.02 plus legal interest. The claim against Home Discount Center and a third party claim brought by Home Discount Center against Maytag were dismissed.
Maytag has appealed, contending that the trial court erred in concluding that the fire was the result of a defect in the clothes dryer, which it manufactured. The only issue which has been raised on appeal is whether or not that factual finding by the trial court is manifestly erroneous.
The parties are in agreement that the standard of law to be applied in a case such as this is expressed in the following language from the opinion of the Louisiana Supreme Court in the landmark case of Weber v. Fidelity & Casualty Company of New York, 259 La. 599, 250 So.2d 754 (1971):
"A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i. e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect." (Citations omitted).
This standard has been applied extensively by this and the other courts of this state in numerous products liability cases which have arisen since the court's decision in Weber, supra. See, for example: State Farm Fire & Casualty Company v. Gibson Products of Sulphur, 346 So.2d 1287 (La. App. 3rd Cir. 1977); Trahan v. Highlands Insurance Company, 343 So.2d 1163 (La. App. 3rd Cir. 1977), writ denied 346 So.2d 208 (La.1977); Rivere v. Philco Corporation, 349 So.2d 971 (La.App. 1st Cir. 1977), writ denied 351 So.2d 171 (La.1977).
The facts relative to the onset and discovery of the fire in the Duplechain home are not in dispute. The fire began sometime after the Duplechains had retired for the evening on April 17, 1976. Prior to retiring, Mrs. Duplechain had placed a load of wet clothing, consisting of towels, wash cloths, diapers and the like, in the Maytag dryer and turned it on, setting the timer for 45 minutes. Whether or not the dryer had completed its cycle and turned itself off prior to the time that Mrs. Duplechain went to bed is unknown.
During the night, she was awakened by the smell of smoke and got up to investigate. Upon entering the utility room, where the dryer was located, she discovered flames on the top surface of the dryer near the control panel. After trying unsuccessfully to extinguish the fire with a small container of water, she went and awakened her husband and children. Mr. Duplechain arose and went to the utility room. By that time the flames, which were still present on the top of the dryer, had spread to the wall behind it, and the fire department had to be summoned to bring the blaze under control.
Maytag concedes that the trial court's conclusion that the fire originated in the dryer and not elsewhere in the utility room is correct. It contends, however, that the evidence presented at the trial does not establish that the fire was the result of some defect in the dryer.
After the fire, the dryer was examined by two men engaged by Hartford for that purpose and a third, who was employed by Maytag. All three testified as experts at the trial and offered opinions as to the cause of the fire. A basic understanding of the design and function of the dryer is *1271 necessary to properly evaluate their testimony.
The machine produces its drying effect by moving large volumes of warm air through the clothing, rather than by application of direct heat. This is accomplished by means of a fan, which draws air through louvers in a portion of the back panel, around the sides of the drum containing the wet clothes, past a heating element, which is an enclosed helix of wire circling the front opening of the drum, and into the drum itself. The air is then drawn by the same fan from the inside of the drum and expelled through a duct at the rear of the machine.
There are two thermostats which control the temperature reached in the drum. There is a cycling thermostat, which is triggered by the moisture content of the air leaving the drum, and is designed to prevent the contents of the dryer from becoming too dry. There is also a high-limit thermostat, designed to turn the heating element off if the temperature in the drum exceeds 160 F.
One of the experts who testified for Hartford was Mr. Bill Allain, Jr., an electrical engineer. He had examined the dryer in November of 1976 and removed the two thermostats. Although he admitted that he did not know what had caused the fire, he suggested that there were several possibilities. One, which he mentioned, was that an unusual material with a low igniting point could have been placed in the drum where it ignited as a result of the normal drum temperature. Another was that both thermostats could have malfunctioned simultaneously, causing the drum temperature to become high enough to ignite the kinds of fabrics normally dried in a clothes dryer.
When cross-examined with respect to the latter theory, Mr. Allain admitted that he did not know what temperature would be produced in the drum by the simultaneous malfunctioning of the thermostats, which he hypothesized. Nor could he approximate the temperature required to ignite the kinds of materials normally found in towels, wash cloths and the like. He did testify that both thermostats were damaged when he inspected them, however, he believed that at least one of them had been damaged by the fire, because the heating element would not have been operative if, prior to the fire, it had been in the condition in which he found it. He could not say whether the other thermostat had been damaged before, or as a result of the fire.
Hartford's other expert was Mr. Joseph P. Granger, an appliance repairman. He disagreed with Mr. Allain's suggestion that the fire might have been the result of the thermostats malfunctioning. It was his opinion that the fire had originated in the control panel at the top of the dryer, rather than in the drum. He believed that the fire was the result of arcing of electrical current from a broken contact in the timer, which ignited the insulation on the wires found in the control panel. When asked if he had dismantled the timer to check for evidence of a broken contact, however, he stated that he had not, because he did not have the necessary equipment and laboratory facilities to do so.
Maytag's expert was Dr. John Hinkley, an independent consultant with a background in physical science and chemistry. In addition to having extensive experience studying fires for the purpose of determining their origins, he had been employed by Maytag to conduct a study after problems had arisen with the drying of certain exotic fabrics imported from the Middle and Far East. In the process of completing that study, he had performed numerous tests, using Maytag dryers similar to the one owned by the Duplechains. As a result of those tests, he was well versed on the design and function of the dryer and the combustability of various fabrics.
Dr. Hinkley disagreed with the theories advanced by Hartford's experts. He testified that even if both thermostats are by-passed and the dryer operated 24 hours per day, the temperature in the drum would not exceed 160° F., because the normal air flow through the dryer would cause the heated air to be removed before its temperature *1272 could rise above that level. He stated that the worst thing that can happen is for the belts operating the fan to break. Even then the temperature would not be higher than 200° to 220° F. He further testified that the lowest temperature at which he had been able to ignite any of the wide variety of fabrics that he had tested (other than the exotic imports referred to earlier) was 450° F.
He agreed with Mr. Granger that the fire had not originated in the drum, because if it had, the air-flow system would have caused the fire to be emitted through the exhaust vent at the rear of the dryer. Since he found only minimal damage to the inside of the drum and virtually none to the aluminum vent, he concluded that although the fire eventually reached the inside of the drum, it burned only briefly there. He also agreed with Mr. Granger that the fire had originated in the area of the control panel because of the fire pattern and the intense damage done to the metal in that area, however, he did not agree with Mr. Granger's theory that the fire was initially fueled by the insulation on the wiring.
According to Dr. Hinkley's testimony, the insulation on the wiring found in the dryer is designed so that although it can burn when a flame from an external source is applied directly to it, it will extinguish itself when the flame is removed. He demonstrated this phenomenon in the court room by taking a wire which had been removed from the dryer and lighting it with a cigarette lighter. The insulation burned while in contact with the lighter's flame, but immediately ceased to do so when the flame was removed. He also testified that although an arc from a shorted wire could ignite a flammable material, it would have to be instantaneous, because the circuit-breaker would be activated almost immediately, causing the arcing to cease.
In Dr. Hinkley's opinion, the fire originated with a pool of flammable liquid on the top surface of the dryer near the control panel, where the extensive damage to the metal had been done. According to his theory, the heat produced by the operation of the dryer caused the flammable liquid to vaporize. The vapors were then drawn by the dryer's air-flow system into the dryer, where it was ignited by the heating element. This caused a brief fire inside the drum and the intense fire on the top surface due to the "flashback" to the pool of flammable liquid.
Hartford argues that either of the theories advanced by its experts as to the cause of the fire are sufficient to establish that the dryer was defective. We disagree. Those theories were thoroughly refuted by Dr. Hinkley's testimony, which was based on a superior knowledge of the causation of fires and of the design and function of the dryer.
In the alternative, Hartford argues that if Dr. Hinkley's theory is accepted as correct, it necessarily follows that there was a defect in the design of the dryer, because the induction of flammable vapors into the dryer via its air-flow system was not somehow prevented. We find this argument equally unpersuasive. Mrs. Duplechain's testimony that she did not store flammable liquids in the utility room, and that there were no such liquids on the surface of the dryer on the night of the fire militates against a conclusion that the fire did, in fact, begin in this manner. However, assuming for the sake of argument that it did, we cannot agree that it would support Hartford's conclusion that there was a defect in the design of the dryer.
In State Farm Fire & Casualty v. Gibson Products of Sulphur, supra, this court noted that the standard of care for a defendant who allegedly produces a defectively designed product approaches the negligence standard. The defendant in this case has produced a household appliance which is commonly known to produce a significant amount of heat. We cannot agree that the manufacturer of such an appliance is negligent simply because that appliance is not designed to prevent accidents caused by the careless or injudicious handling of flammable liquids by consumers. If the Maytag dryer was found to be defective on such a basis, it is very likely *1273 that the overwhelming majority of common household appliances on the market today, such as toasters, hot water heaters, hair dryers, etc. would have to likewise be deemed defective.
Hartford makes much of the fact that the damage done to the dryer obscured much of the evidence, making it more difficult to prove its case. It points out that in the Weber case, supra, virtually all of the physical evidence (i. e., the cattle dip solution, measuring cup, etc.) had been buried under a highway and was unavailable for use at the trial, yet the plaintiffs' evidence was found to be sufficient.
Admittedly, there are similarities between this case and the Weber case, however, there is crucial distinction between the two. In Weber, the plaintiffs were able to establish by a preponderance of the circumstantial evidence that there was a specific defect in the cattle dip solution, that defect being the presence of an excessive amount of arsenic. Hartford has not done that, here.
In a products liability case, as in any other civil case, the plaintiff has the burden of proving causation by a preponderance of the evidence. Weber, supra. We do not believe that Hartford has adequately met that burden in this case. The evidence which it presented was at least inconclusive, if not more so, than that which was found to be inadequate in State Farm Fire & Casualty Company v. Gibson Products of Sulphur, supra, and Rivere v. Philco Corporation, supra.
Under these circumstances, we believe that the trial court's finding that the fire was the result of "some unknown but inherent defect" in the Maytag dryer is manifestly erroneous, and that its judgment in this case must, therefore, be reversed.
For these reasons, the judgment appealed from is reversed and judgment is hereby rendered in favor of defendant, dismissing plaintiff's suit. All of the costs of the trial and this appeal are assessed against plaintiff.
REVERSED AND RENDERED.