COLE, Judge.
The issue presented is whether or not the plaintiff proved by a preponderance of the evidence its insured’s home was destroyed by fire due to the fault of the defendants. Because we find the plaintiff has failed in this burden of proof, we reverse the judgment of the trial court.
The facts giving rise to this litigation are as follows. Plaintiff’s insured, Yvonne Lewis Day, purchased a home from defendant Belle Alliance Homes, Inc. (herein referred to as Belle Alliance) on April 12, 1977, and had occupied the home since April 1, 1977. Belle Alliance had built the home as a “spec house” and had subcontracted all electrical work to Langlois Electric Company, Inc. (herein referred to as Langlois).
On the morning of February 28,1978, Ms. Day awoke to find the house afire. Almost all of the structure and the entire contents were destroyed. Her insurer, Blue Ridge Insurance Company (Blue Ridge) paid a total of $59,550 under its policy provisions. Exercising its subrogation rights, Blue Ridge then filed suit for this amount against Belle Alliance and Langlois, alleging the fire was caused by defects in the electrical system, particularly in the circuit breaker panel and/or the disconnect switch box. They specifically alleged both parties were negligent for failing to properly wire the house and in using defective electrical materials.
Belle Alliance made a third party demand against Langlois and later Belle Alliance and Langlois both made third party demands against I.T.E. Imperial Corporation, the manufacturer of the circuit breaker and all circuit protection equipment used in Ms. Day’s home. However, the demands against I.T.E. were apparently not pursued as a part of this litigation in that the record shows I.T.E. did not answer the demands nor did they participate in the trial.
After hearing the testimony and examining the various photographs of the burned house, the trial court rendered judgment in favor of the plaintiff and against the two defendants in solido. The court further held in favor of Belle Alliance on its third party demand against Langlois. Both defendants have appealed.
In order to understand our decision to reverse the trial court it is necessary we discuss the evidence brought forth at trial. To assist in this discussion we have prepared from the evidence adduced a diagram which is attached to and made part of this opinion. The house, as set forth in the diagram, was a four-bedroom home with the bedrooms located on the west side, the family room at the center, and the living room, kitchen and breakfast room located on the east side. Photographs show the most extensive damage was to the carport, the kitchen and the family room.
Ms. Day testified extensively as to the conditions she found upon waking that morning. Her electric clock read 6:15 although it was later discovered the time was actually about 7:45. When she first awoke she heard a strange noise coming from the family room so proceeded to investigate. When she entered the family room she noticed flames in the area marked “A” on the diagram. She walked on to the kitchen, thinking she could put the fire out with water. In the kitchen she looked up at the ceiling and saw smoke coming through the sheetrock “like a sieve.” She then realized the severity of the situation and exited from her house, using the door located in the area marked “C” on the diagram. She stated she did not observe any flames or smoke near the door or in the area marked “B” on the diagram.
Ms. Day then went through the carport to her neighbor’s house in order to call the fire department. When she glanced back toward her house she noticed flames and smoke near the ceiling of the carport and also on the vinyl roof of her car. The fire department responded promptly to her call but was unable to save the house from-almost total destruction.
Ms. Day testified that in the eleven months she had occupied the house she had *419 experienced several minor electrical problems such as two “dead” outlets and trouble with the central air conditioning unit. The air conditioning problem was remedied by an electrician sent out by Belle Alliance but the problem with the outlets was never solved.
Ms. Day also testified she did not use the heater or air conditioner the night before the fire and was almost certain she had left no lights on. The attorney for Langlois impeached Ms. Day’s testimony concerning the light by introducing a written statement signed by her the day of the fire in which she indicated she had left on a swag lamp in the area of the family room marked “A” on the diagram. At trial she stated neither she, nor her housekeeper, nor her visitor of the night before smoked cigarettes. She further stated she had done no cooking, washing or ironing the night before the fire. The evidence discloses the swag lamp was connected with an electrical cord to an outlet. It was not part of the original house, but was purchased from a retail store.
Two experts testified as to the possible causes of the fire. Plaintiff called Dr. Leonard Adams, professor of electrical engineering at Louisiana State University, and the court accepted him as an expert in the cause and origin of electrical fires. He stated he had visited the burned site twice in the weeks following the fire. He removed both circuit boxes[1] from the home and examined them. He concluded the fire was electrical in nature and probably started in the breaker box located in the wall between the utility room and the family room, in the area marked “B” on the diagram. Dr. Adams could not point to any specific defect in the breaker box because the box was so badly damaged by the fire. Nor was he able to show specifically that the box or the general wiring of the house had been installed improperly. His conclusion as to the origin of the fire was based upon the fact that the heaviest area of damage was in the utility room and that the areas adjacent to the utility room were more severely burned than the rooms in other areas of the house. He theorized the fire started in the wall and traveled up into the attic, thus explaining why Ms. Day noticed smoke seeping through the ceiling of the kitchen and later saw smoke and flames at the carport ceiling.
Dr. Adams could not explain why Ms. Day was able to exit the house through the back door (marked as “C” on the diagram) which was located adjacent to the place he believed the fire to have started. His only hypothesis was that there may have been flames up at the ceiling level but Ms. Day may have been too excited to notice. He stated that since the breaker box was located in the wall between the utility and family rooms, it was possible for the two layers of sheetrock to act as a chimney, carrying the flames up to the attic level without actually burning through the wall down below.
When asked to explain why Ms. Day observed flames in the area marked “A” on the diagram, Dr. Adams offered several theories. One was that the fire had traveled from the utility room wall up into the attic, burned across the cathedral ceiling of the family room and then descended into the area marked “A.” Another is that the fire spread horizontally from the breaker box along the rear wall of the family room, over to area “A.” (This statement was made in a deposition offered into evidence.) He admitted that in the latter situation the door used by Ms. Day would have been burning or would have already burned at the time she exited the house.
Defendant Belle Alliance called as an expert Mr. Robert Nethken, associate professor of electrical engineering and construction at Louisiana State University. He was *420 accepted by the court as an expert in electrical construction, including electrical wiring and the causes of electrical fires. Mr. Nethken did not visit the scene of the fire but based his conclusion on various photographs, the statements and testimony of Ms. Day, and the deposition of Dr. Adams. He too examined the breaker boxes.
Mr. Nethken stated he did not believe the fire started in the utility room because the burn pattern indicated to him the fire entered the utility room from the south (the kitchen area) and from the north (the carport area). He theorized the fire started in the area marked “A” where Ms. Day first saw the flames and where the swag lamp was located. He stated there could have been a malfunction in the cord of the lamp or in the fixture itself. He explained a piece of molten copper could have dropped from the lamp and ignited the carpet below. He admitted he could not state this caused the fire with even a 50% probability, but he could rule out certain causes, like the breaker box, as being the source of the fire.
On cross examination it was pointed out the photographs taken of the outside rear portion of the house showed the area immediately to the right of the area marked “A” was not burned nearly as severely as the other side (the eastern side) of the house where the breaker box was' located. ’ Neth-ken theorized the fire had not spread in a westerly direction because the cathedral ceiling in the family room may have slowed its progress. He also noted the wall between the family room and the bathroom contained a built-in bookcase and that books are very difficult to burn. Therefore, he explained, the fire may have been impeded from spreading in a westerly direction for this reason also.
Mr. Nethken further noted the wind was out of the southwest at seven knots an hour on the morning of the fire. He concluded it was possible the wind entered the house (which faced south) through the western gables in the attic and caused the fire to spread toward the eastern side of the house, thus explaining why the eastern side was more damaged than the western side.
Ultimately Mr. Nethken stated the problem was probably electrical in origin although he could not say it was caused by a malfunctioning electrical appliance rather than the wiring. When asked why the area around the breaker box was so severely burned he stated that when the fire reached the utility room the box caught on fire, causing a chain of electrical faults to occur. According to Nethken, a great deal of damage is to be expected anytime a breaker box is involved in a fire. In his opinion, if the fire had started at the breaker box it would have been impossible for Ms. Day to have used the back door to leave the house.
Nethken explained the clock stopping at 6:15 (about an hour and a half before Ms. Day discovered the fire) by the fact that the flames had already gone up to the attic level where the “romex” would be triggered and would cause the breaker box to kick off. He stated that even though the fire may have started at area “A,” the flames Ms. Day observed there were certainly not the original flames. The fire had obviously been burning awhile as evidenced by the smoke seeping through the ceiling from the attic.
Mr. N. R. Langlois, of Langlois Electric, Inc., testified although he did not personally perform the wiring on the house, he made daily inspections of the work done by his employees and found all work to meet code requirements. The city building inspectors examined the house twice, once before the walls were closed up and once at the end of the construction. They found all electrical work to be satisfactory.
Mr. Joseph Grisaffe, president of Belle Alliance, stated he checked the breaker box during construction of Ms. Day’s home. He made sure the switches in the box were not loose.
In written reasons for judgment the trial court stated:
“Dr. Adams’ explanation of the burn pattern and location of the breaker box with *421 respect to the destroyed area, when considered in light of the testimony of Mrs. Day and the photographs of the burning house, was sufficient to prove the breaker box was the origin of the fire.”
The court then stated the applicable standard of proof, even in cases involving circumstantial evidence, is that when taken as a whole, the evidence must show the fact or causation sought to be proved is more probable than not, citing Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971). The court found this burden to be met. The court further stated if the circumstantial proof excludes other reasonable hypotheses with a fair amount of certainty, so that it is more probable than not that the harm was caused by the tortious conduct of the defendant, then plaintiff should recover, citing Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395 (1963), rehearing denied 1963.
We realize the trial court has a great deal of discretion in the fact finding process. But after carefully examining the record we conclude the court was clearly wrong in accepting the evidence as proving (more probably than not) the breaker box was the cause of the fire. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), rehearing denied 1979. We reach this conclusion because we find plaintiff has not excluded other reasonable hypotheses (particularly the swag lamp theory) with a fair amount of certainty.
The record reflects clearly both experts agree the fire was probably electrical in origin and both admit it is impossible to determine the actual cause of the fire from the evidence. Both experts simply offered their theories, based on the available evidence, as to how the fire occurred.
On the one hand, although Dr. Adams’ breaker box theory is entirely reasonable, it contains gaps which weaken it. His theory is damaged by the fact Ms. Day was able to exit the house through the back door located only a few feet away from the source of the fire which had been burning for over an hour. She noticed neither smoke nor flames in this area of the room. Any suggestion Ms. Day was too “excited” to notice the flames is refuted by reading her testimony in the record. She testified in explicit detail as to every event surrounding the fire, including such minutia as the fact a child’s sweater was draped over the sofa in the family room and her neighbor held a garment in her hand when Ms. Day went next door to use the phone. We are convinced Ms. Day was keenly aware of the conditions existing in the room at that time and we are confident if she did not observe smoke or flames coming from area “B” or “C,” then none were there.
On the other hand, Mr. Nethken’s swag lamp theory is also reasonable and hasn’t been excluded with a fair amount of certainty. The trial court seemed to place some significance in the fact the swag lamp was fairly new (ten months) and had worked properly. However, the breaker box was also fairly new (eleven months) and it too had worked properly up until the time of the fire. Further, the swag lamp was located in area “A” where Ms. Day first observed the flames. If the fire originated in that corner of the room it is understandable how she was able to exit through the door located in area “C.”
Certainly we are not deciding here which theory is the more credible, but are simply noting both theories are reasonable and the evidence put forth by plaintiff does not exclude defendants’ theory with a fair amount of certainty. (Obviously, if the fire had originated because of a defect in the swag lamp, the builder and electrician would have no liability whatsoever.) The evidence as a whole shows the house was so badly damaged it is impossible to determine what caused the fire. We cannot say plaintiff has met his burden of proof as to the origin of the fire.
After concluding the evidence was sufficient to establish the fire started in the breaker box, the trial court was then faced with the decision of whether or not there *422 also was sufficient evidence that defendants were negligent. We note the record reflects neither expert could say the box had been improperly installed or the house improperly wired, so there was no evidence defendants acted negligently. The trial court solved this problem by applying the doctrine of res ipsa loquitur, thereby concluding that although there was no showing of any specific acts of negligence, this type damage usually would not occur without negligence. Therefore, the two defendants were held to be responsible for the fire.
The court reasoned as follows:
“In this case the facts suggest negligence of the defendants as the most plausable (sic) explanation for the fire. There is no other explanation for the breaker box to malfunction than a defect in its construction and/or installation. Once the surrounding circumstances justify the inference of negligence, as they do here, it is up to the defendants to overcome this inference. Hake v. Air Reduction Sales Co., 210 La. 810, 28 So.2d 441 (La.1946).”
Even if we agreed with the trial court that plaintiff had proved the breaker box to be the cause of the fire, we would decline to apply the doctrine of res ipsa loquitur to the present case.
There are three basic conditions necessary for the application of the doctrine. One, the circumstances must be such as to create an inference of negligence on defendant’s part. Two, the control and management of the instrumentality causing the damage must have been in the exclusive control of the defendant. Three, plaintiff must not have been in a position to know the particular circumstances which caused the instrumentality to operate to plaintiff’s injury, whereas, the facts are such that defendant is presumed to possess superior knowledge in this regard. Alexander v. St. Paul Fire & Marine Insurance Co., 312 So.2d 139 (La.App. 1st Cir. 1975), writ refused 1975.
Without even considering the other two requirements we reject the application of this doctrine because we find the circumstances do not create an inference of negligence on the defendants’ part. Both experts admitted they could not find any evidence of improper wiring or improper installation of the breaker box. Mr. Grisaffe testified he checked the box for loose switches. Mr. Langlois testified he checked the wiring daily and that the city inspectors had examined it twice. This record discloses there was not one iota of evidence showing defendants to have acted negligently.
It must be noted the trial court concluded there was no explanation for the fire other than a defect in the “construction and/or installation” of the breaker box. We concede since both experts testified the fire was probably electrical in origin it is possible the breaker box was defectively constructed.[2] However, we know of no authority stating a home builder or his subcontractor is responsible for a properly installed electrical component which performs satisfactorily for eleven months before failing with resultant damages due to the manifestation of a manufacturing defect. In any event, and assuming, arguendo, the defendants may be considered a “manufacturer,” plaintiff has the burden of proving by a preponderance .of the evidence a defect in the breaker box caused its loss.[3] Weber v. Fidelity & Casualty Company of New York, 259 La. 599, 250 So.2d 754 (1971); Hartford Fire Insurance Company v. Maytag Company, 374 So.2d 1269 (La.App. 3d Cir. 1979). Here, no evidence of any defect was presented and a defect cannot be inferred solely from the fact the fire occurred. See, *423 e.g., John Robert Broussard and Patsy L. Broussard, Individually, etc. v. Pennsylvania Millers Mutual Insurance Company, et al., 406 So.2d 574 (La.1981).
Our brethern on the Third Circuit recently considered a case factually similar to the present one. In Western Cas. & Sur. Co. v. Adams, 381 So.2d 923 (La.App. 3d Cir. 1980), the new home of plaintiff’s insured was destroyed by fire only four weeks after it was occupied. Plaintiff sued the general contractor, the electrical subcontractor and the manufacturer of the central heating unit. The expert utilized stated the fire was caused by some unknown defect in the heating unit but found no evidence of faulty wiring or installation. The trial court dismissed the case, stating no negligence had been proven, nor were other hypotheses excluded with “a fair amount of certainty.” The appellate court affirmed. Plaintiff contended on appeal the doctrine of res ipsa loquitur should apply to infer the existence of a defect in the design and/or manufacture of the house or of the heating unit. The court refused to do so, noting:
“The circumstances of this case are not such that in the absence of an explanation by defendants the only fair and reasonable conclusion is that the fire was caused by some omission of defendants’ duty. Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621 (1972).”
We too feel the circumstances of the present case do not cause us to conclude there has been some omission of defendants’ duties. We note in the case just cited the manufacturer was a defendant yet the court still refused to find an inference of negligence. Certainly the present case, involving only the builder and the electrician, is an even stronger one for refusing to find an inference of negligence.
For the foregoing reasons, the judgment of the trial court is reversed. Costs are to be paid by appellee Blue Ridge.
REVERSED.

*424

. The other circuit box was located in the storage room on the other side of the carport and does not seem to have been involved in the fire.

. For purposes of this part of the opinion we are assuming there was sufficient evidence showing the breaker box was the cause of the fire.

. Regardless of whether Belle Alliance be considered a “manufacturer” or be considered a “seller,” it is the burden of plaintiff to establish by a reasonable preponderance of the evidence that a defect was in fact present in the breaker box.