**VARIOUS UNDERWRITERS AT LLOYDS**

v.

**PAGE AIRMOTIVE, INC., et al.**

**Civ. A. No. 16025.**

United States District Court,
W. D. Louisiana,
Monroe Division.

March 7, 1975.

J. B. Gooch, Jr., Harold B. Carter, Jr., A. Gordon Grant, Jr., Montgomery, Barnett, Brown & Read, New Orleans, La., for plaintiffs.

Allen L. Smith, Jr., Plauche, Smith & Hebert, Lake Charles, La., for defendants.

DAWKINS, Senior District Judge.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

### Findings of Fact

1. At all pertinent times, plaintiffs were foreign insurance underwriters doing business in this State and District and are proper parties to bring this action.

2. At all pertinent times, defendant, Page Airmotive, Inc. (Page), was and is a corporation organized under the laws of Oklahoma doing business in this State and District and within the jurisdiction of this Court.

3. At all pertinent times, defendant, Fidelity and Casualty Company of New York, was the liability underwriter of Page, affording coverage for the claims asserted by the plaintiffs against Page in this action.

4. At all pertinent times and more particularly on September 15, 1969, Nelson Summerell, d/b/a Summerell Flying Service, was the owner of a Gruman Super Ag Cat, Model G–164A Aircraft bearing Federal Registration No. N–5345.

5. On September 15, 1969, this aircraft crashed while engaged in a crop-dusting flight near Ferriday, Louisiana, fortunately causing no injury to its pilot.

6. As a result of the crash the aircraft sustained physical damage necessitating repairs in the total sum of $15,985.67.

7. At all pertinent times, and more particularly on September 15, 1969, plaintiffs were signatory underwriters to a policy of aircraft hull insurance pursuant to which they were called upon to pay and did pay to Nelson Summerell, d/b/a Summerell Flying Service, as owner of the aircraft, the sum of $12,785.69 and by reason of that payment are subrogated to the rights of Summerell in the premises.

8. The amount of plaintiffs' damages at issue here is the sum of $12,785.69.

9. When the crash occurred, the aircraft was equipped with a Pratt and Whitney R–985–AN–1 radial engine, which had 325 operating hours since overhaul. This engine is a nine-cylinder aircooled, radial aircraft engine. It has 985 cubic inches of cylinder displacement. The engine is composed, from front to rear, of (1) a nose case containing the cams and valve tappet rollers. The second case is (2) the main case, to which the cylinders are radially attached. Behind the main case is (3) the blower case which contains an integral centrifugal supercharger, the function of which is to pull atmospheric air through the carburetor of the engine and then to force the air-gas mixture produced by the carburetor to the combustion chambers of each cylinder through tangentially mounted intake tubes connecting the intake manifold of the engine to the intake valve ports of each cylinder. The rear, or (4) accessory, section of the engine is attached to the blower section. It carries various accessories including magnetos and a single up-draft carburetor.

10. This type engine has not been manufactured for many years. Page is a licensed, limited repair station, approved by the FAA to perform major overhauling of Pratt and Whitney engines, including the engine here involved. Part of the overhaul procedure involves complete disassembly of the entire engine for cleaning and inspection. All parts are checked and measured by an inspector to determine which need to be replaced and which can be retained for reassembly of the engine. All parts not meeting acceptable tolerances prescribed by Pratt and Whitney are discarded and replaced. All of the replacement parts are examined visually and measured with a micrometer to confirm that they are within the published tolerances prescribed by Pratt and Whitney. The engine then is reassembled by the assembly department. During various phases of the reassembly inspection is made at prescribed intervals by the inspection department. After complete reassembly and final inspection, the engine is subjected to three hours, fifty minutes of dynamic testing where it is run on a test stand at various loading conditions.

11. The cause of the aircraft crash giving rise to this action was the stoppage of the aircraft engine. This was caused by the initial failure of one or more of three ball bearings supporting the impeller and impeller shaft in the supercharger section of the engine. Complete failure of one or more of the ball bearings resulted in severe internal damage to the impeller and shaft which resulted in complete failure of the supercharger section and stoppage of the engine. At the time of engine failure, the recording tachometer in the aircraft revealed 325 hours of operation of the engine. This is less than the life expectancy of the engine, since it normally can be expected to accumulate operating time for approximately 1,000 hours or more between major overhauls. The ball bearings in the supercharger section of the engine should last the life of the engine without failure or replacement between overhauls. The ball bearings supporting the impeller in the supercharger assembly are not subject to routine maintenance or inspection and it is necessary to dismantle the entire engine in order to inspect the bearings. Complete disassembly of this nature legally can be performed only by an FAA approved repair station such as Page.

12. The engine installed in the Summerell aircraft was received by Page Airmotive as a trade-in during January, 1969. It was subjected to the usual disassembly and cleaning procedures, after which all of the parts were inspected by Joe Kupka, chief inspector at Page at that time and at the trial.

13. Kupka inspected the blower assembly cage for out-of-roundness and concentricity, having found that it met all tolerances prescribed by Pratt and Whitney. He also measured by micrometer the impeller shaft and impeller before it was shipped to Custom Engine Service in Hialeah, Florida, for dynamic

balancing, a procedure which was recommended by Pratt and Whitney but not required as an overhaul specification. Kupka found that the impeller shaft and impeller were "true" and met all required standards for concentricity and roundness.

14. The entire blower section again was inspected visually and checked with micrometer by Joe Kupka preparatory to reassembly. This inspection and measurement was made at the inspector's station at Page's shop which physically was located at a bench across from Leon Statton, the final assembler. The distance separating the inspector and the assembler was 8–15 feet. Both assembler and inspector knew the duties and responsibilities of the other. They were in constant audio-visual contact, both had available the Pratt and Whitney overhaul manual published by the manufacturer, and both constantly were aware of what the other was doing.

15. All of the parts for the assembly of a complete engine were collected on a parts table which was circulated through the assembly section after inspection. Joe Kupka personally examined all of the parts necessary for assembly of the complete supercharger section of the engine. He found specifically that the impeller shaft and impeller were concentric after balancing and that they met the published tolerances. He also found that the collector case in which the impeller and impeller shaft were housed were within the published tolerances; and all of the three ball bearings which supported the shaft inside the collector case also were measured by micrometer and found to be within the published tolerances.

16. At the time of assembly of the blower section, Leon Statton knew the published tolerances for the parts he was assembling. Therefore, he knew which parts were supposed to be "tight" and which were allowed to have a "loose fit." During assembly of the supercharger section of the engine in question, all of the parts were assembled without problem and, even though he had no responsibility to remeasure the parts, he assembled them without recalling any abnormalities or other problems.

17. After accepting delivery of the airplane, its owner, Nelson Summerell, flew the aircraft for the initial 50 hours with break-in oil. After 50 hours of operating time, the oil was changed and replenished with 60 weight, ashless dispersant detergent oil. Thereafter the oil was changed at approximately 100-hour intervals. The aircraft used approximately one gallon of its seven-gallon capacity of oil every 10 operating hours. The aircraft was flown before the crash during the peak crop-spraying season of June, July, August, and September, 1969, so that approximately one gallon of oil was added every day.

18. During operation of an aircraft engine, there is normal wear evidenced by very small metallic particles which become suspended in the oil. Additionally, around the piston area where combustion is taking place, the gasoline and air mixture do not burn "100 percent," resulting in the deposit of carbon on the pistons and rings which are lubricated by the engine oil. Contamination of the oil by carbon may result in a chemical change in the oil allowing a build-up of acid. During the heating and cooling of the engine parts during and after use, some condensation may take place inside the engine with resultant deposition of moisture in the engine oil. Finally, during operations in aerial application, the aircraft is flown through dust and chemical spray which may permeate the air filters or bypass a filter which has been replaced and does not fit tightly, resulting in contamination of the oil by dust and dirt particles. The addition of fresh oil to replace oil as it is used does not rid the engine of such contaminants which are removed only by a complete oil change.

19. The failure of the engine was caused by initial failure of one or more of the three ball bearings supporting the impeller shaft in the supercharger section. None of the experts could tell from examination of the remaining en-

gine parts which of the bearings failed first. However, a metallurgical test of all engine parts was performed by United States Testing Company, Inc., of Tulsa, Oklahoma. That firm reported that, as a result of its visual, microscopic, and metallurgic examination, there were observed and photographed characteristic marks on the remaining balls and raceways, consisting of high and low areas on the surface of the balls and raceways, with scratching and pitting around the periphery of the race corresponding with the scoring of the balls. These characteristic markings are evidence of the presence of dust or dirt in the oil, or contamination in the form of very fine abrasives such as lint or dust. These abrasives will act as lapping agents, altering the appearance of the balls and raceways in the manner found and photographed by United States Testing.

20. The expert testimony of Mr. Curtis Line and Dr. Raymond Kaser convinces us that this engine probably would not have operated 325 hours (and nearly seven months) if the assembly of the engine had included a part which did not meet published tolerances or if any part had been installed improperly. The supercharger assembly operates at a ten-to-one ratio with the drive shaft of the engine. During normal operations the impeller shaft speed will vary between 15,000 and 31,000 r. p. m. The tolerances are extremely close, and those tolerances and the balance of the impeller and impeller shaft, are critical to operation of the supercharger section. We are convinced that a defective or improperly installed part, which would either impede movement of the rotating impeller and impeller shaft by too tight a fit or would allow movement or endplay of the shaft, by too loose a fit, would have resulted in either instantaneous failure or failure of the supercharger section within the initial operating hours. The engine would not have run without problems for 325 hours.

21. The most probable cause of the bearing failure was operation of the engine with contaminated oil resulting in the characteristic etchings, deformation, and failure of the ball bearings observed by the metallurgists following the engine failure.

22. We conclude, therefore, that plaintiffs have failed to prove by a preponderance of the evidence that the engine failure was caused by, or the result of, a defect in the engine, resulting either from inclusion there of a defective or improper part, or defective or improper assembly of the engine.

### Conclusions of Law

1. Our jurisdiction is based upon diversity of citizenship and the amount in controversy, exclusive of interest and costs, exceeding $10,000. The airplane crash giving rise to this action occurred in Louisiana. Accordingly, the substantive law of Louisiana is applicable. 28 U.S.C. Section 1332. Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1937).

2. In Louisiana, a manufacturer of a product which involves risk of injury to its user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains injury caused by a defect in the design, composition, or manufacture of the article, if the injury reasonably might have been anticipated. However, a plaintiff claiming injury has the burden of proving that the product was defective, i. e., upnreasonably dangerous for normal use, and that plaintiff's injuries were caused by reason of the defect. Weber v. Fidelity & Casualty Ins. Co. of N. Y., 259 La. 599, 250 So.2d 754 (1971), and the cases cited therein.

3. Plaintiff's burden of proof in a products liability case in Louisiana, as stated by the court in *Weber*, is two-tiered. Plaintiff first must prove that the manufacturer's product was defective. In order to establish defectiveness, plaintiff must show that the product was in normal use and that the product was unreasonably dangerous in that use. After proving that the product was defective for normal use, plaintiff then must show that his injuries were caused by the defect. Perez v. Ford Motor Co.,

497 F.2d 82 (5th Cir., 1974), Weber v. Fidelity & Casualty Ins. Co., *supra.*

4. Plaintiff's burden of proving that the product was defective must be by a preponderance of the evidence, as in any civil case. Plaintiffs may meet the burden either by direct or circumstantial evidence. Here, plaintiffs must have proved by a preponderance of the evidence that the damages sustained were caused by a defective aircraft engine. Although they must prove that the defect existed, they are not required to negate all other possible causes in order to support judgment in their favor. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971), Naquin v. Marquette Casualty Co., 244 La. 569, 153 So.2d 395 (1963). Taken as a whole, however, the circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. Naquin v. Marquette Casualty Co., *supra.*

5. Plaintiffs here have failed to bear the burden of proving by a preponderance of the evidence that the engine overhauled by Page was defective or unreasonably dangerous to normal use. On the contrary, defendants have proved by most persuasive evidence that each engine part used in the reassembly and overhaul of this engine carefully and visually were examined and measured by micrometer to confirm that its parts were within the published tolerances prescribed by Pratt and Whitney's overhaul manual. The inspector and assembler testified that all of the engine parts were inspected and met all required tolerances. Assembly was performed properly and in accordance with the overhaul manual specifications. The engine operated for 325 hours normally and without any evidence of internal problems. Thus, we find that the engine was not defective, either by inclusion of parts not meeting required tolerances published by the manufacturer, or by negligence in improper assembly of its parts.

6. We further find that the most probable cause of the engine stoppage was the initial failure of the ball bearings supporting the impeller shaft in the supercharger section. Metallurgi-

cal and microscopic examination following failure revealed characteristic markings and deformations of the balls and raceways of the roller bearings known to be caused by dirt, dust, lint, or other abrasive contamination of engine oil. We conclude, therefore, that the most probable cause of the initial bearing failure was excessive wear and deformation as a result of contamination of the cooling and lubricating oil in which it operated. Prevention of excessive engine wear by contaminated oil can be done only by completely changing the oil, an operation exclusively within the charge of Summerell Flying Service, and over which Page had no control whatsoever.

Judgment will be entered accordingly.

## JUDGMENT

This action having come on for trial before the Court, without jury, on October 28–29, 1974, and for the reasons given in our Findings of Fact and Conclusions of Law, this date filed,

It, therefore, is ordered, adjudged, and decreed that plaintiffs herein take nothing, that their demands against defendants are without merit, and, accordingly, hereby are dismissed at plaintiffs' cost.