FORET, Judge.
James A. Jewell (plaintiff) brought this products liability action to recover damages for personal injuries he sustained when the fuel tank on a truck exploded while he was filling it. The sole remaining defendant is CONOCO, Inc. (CONOCO).
After trial on the merits, the trial court rendered judgment in favor of CONOCO, dismissing plaintiff’s demands against it.
Plaintiff appeals and raises the following issues:
(1) Whether the trial court placed the correct burden of proof on plaintiff, who attempted to prove his case by circumstantial evidence, and
(2) If not, and if plaintiff is entitled to recover from CONOCO, what is the correct amount of damages due him.
FACTS
On October 31, 1978, plaintiff sustained severe burns to the upper half of his body. On that date, he was employed as a truck driver by Ricky Thompson (Thompson). Lonnie Blackmon, Jr. (Blackmon) was a contractor for Boise Southern Company, for whom he hauled purchased wood chips. Thompson was one of Blackmon’s sub-contractors. Under an agreement between Thompson and Blackmon, Thompson’s drivers were allowed to fill their trucks with diesel fuel from a 4800-gallon storage tank located at Blackmon’s place of business in DeRidder.
On the day of the accident, plaintiff had stopped at Blackmon’s around dusk to fill his truck with diesel. He had filled the right tank, and was filling the left when *777 the accident occurred. The trial court described the accident as follows:
“As the task neared completion an invisible but volatile vapor cloud collected around Jewell. In a nightmarish sequence, the vapor ignited and Jewell became a human torch, suffering such burn injuries over the upper portion of his body that the verbal description becomes grotesque. Something of the extent of the horror can be conveyed by noting that his nose was burnt off as well as most of his ears and even the enamel on his teeth.”
As a result of the accident, plaintiff filed suit against numerous defendants, alleging various acts of negligence on the part of each. In turn, some of these defendants filed third party demands against each other. Georgia Casualty and Surety Company, Blackmon’s workmen’s compensation insurer, intervened in these proceedings, seeking to recover the amount of workmen’s compensation benefits it had paid plaintiff. Various other parties also intervened in these proceedings, seeking to recover from any judgment that might be awarded in plaintiff’s favor.
Prior to trial on the merits, plaintiff dismissed his action against certain defendants without prejudice. Certain other defendants were released by plaintiff after he entered into settlement agreements with them. CONOCO was the only remaining defendant at the time of trial.
This case was first tried before a jury which was unable to reach a verdict. Consequently, the trial court declared a mistrial. Upon the joint motion of plaintiff, CONOCO, and Georgia Casualty and Surety Company, the case was submitted to the trial court for judgment based upon the existing record. The trial judge who had presided over the jury trial of this matter then recused himself, and the Louisiana Supreme Court assigned the Honorable H. Ward Fontenot as a judge pro tempore of the Thirty-Sixth Judicial District Court, Parish of Beauregard, for the purpose of disposing of this matter. The case was then submitted to Judge Fontenot who rendered judgment, dismissing plaintiff’s demands against CONOCO. Judge Fontenot further rendered judgment, dismissing the petitions of intervention. Plaintiff and in-tervenors appeal from that judgment.
PLAINTIFF’S BURDEN OF PROOF
Plaintiff contends that the trial court erred in applying the wrong burden of proof to his case. He notes that he had to rely solely on circumstantial evidence in attempting to prove that the diesel fuel had been contaminated with leaded gasoline before it left the CONOCO refinery. He points to the following language used by the trial court in its written reasons for judgment and argues that this shows that the court applied the wrong burden of proof in deciding this case:
“Having concluded the existence of contaminated fuel as explained in preceding paragraphs, the next inquiry must relate to the source of that contamination. To sustain his burden, plaintiff must prove that, more likely than not, the contamination occurred at the Conoco refinery before the fuel was pumped by Clavier into the Distributor’s truck.
“Plaintiff’s burden is made difficult because no direct evidence exists of contamination at the refinery. In the language so frequently used relating to circumstantial evidence, plaintiff must prove his case by excluding equally plausible explanations.” (Emphasis ours.)
It is plaintiff’s position that the above emphasized language is an incorrect statement of the law regarding the burden of proof placed on a party who attempts to prove his case through the use of circumstantial evidence.
In a case somewhat similar to this, Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754 (1971), stated that:
“In this civil case, the plaintiffs’ burden is to prove causation by a preponderance of the evidence. This burden may be met either by direct or, as in this case, by circumstantial evidence. Jordan v. *778 Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971); Naquin v. Marquette Cas. Co., 244 La. 569, 153 So.2d 395 (1963).
As we stated in the latter decision, 153 So.2d 397: “Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation.” ” (page 757)
We do not believe that the inaccurate paraphrasing of the law regarding proof of causation by circumstantial evidence found in the trial court’s written reasons for judgment necessarily means that it placed the wrong burden of proof on plaintiff. However, we will review the evidence to make a determination as to whether plaintiff met his burden of proof.
With respect to the origin of the diesel fuel in question, the trial court made the following finding of fact with which we agree:
“Jewell was a truckdriver working for Ricky E. Thompson, and had been hauling pulpwood for the Blackmon Trucking-Company (“Blackmon”). Under the arrangement between Blackmon and truckers like Thompson, fuel was made available at the Blackmon yard from a 4,800 gallon, above-ground tank. The fuel was not available to the public and was not involved in any sales transactions. It was from this tank that Jewell was pumping at the time of the accident.
“Blackmon had purchased the fuel from Smith Oil Company (“Smith”) which operates a wholesale petroleum product outlet commonly referred to as a bulk plant. The product in the Blackmon tank had traveled from Smith’s bulk plant.
“Smith usually received his diesel product from the Conoco refinery by way of trucks belonging to the Distributor’s Oil Company (“Distributor’s”).
“Distributor’s was the Sinclair Oil Company dealer but through an arrangement between Sinclair and Conoco, the product which Distributor’s marketed as Sinclair was refined by Conoco.
“The Conoco refinery from whence Distributor’s had received the fuel destined for Smith had a key stop truck terminal. This is an automated facility where customer trucks may pick up the desired product 24 hours a day without the need for Conoco personnel to be present. In the instant case, one of two brothers named Clavier, drivers for Distributor’s, had picked up the fuel from the refinery and transported it to Smith’s holding tank.
“While some question about the origin of the fuel is raised, it was not seriously pursued. The route of the fuel in Black-mon’s tank on the day of the accident can easily be traced back to this Conoco refinery.”
The trial court further found that the diesel fuel contained in Blackmon’s tank on the day of the accident was contaminated with leaded gasoline, and we agree. Thus, plaintiff had to prove that, more likely than not, the contamination occurred at the CO-NOCO refinery.
March Oliver was employed as Chief Refinery Chemist by CONOCO at the refinery where the diesel fuel in question had been produced. He supervised and directed the work on the refinery’s laboratory which included the testing of samples taken to guarantee the quality of products made there. He stated that the final testing point for diesel at the refinery was when it was placed in the bulk loading storage tanks. ■ No diesel was allowed to leave these tanks until it met all of the pertinent specifications. He identified certain documents presented to him as being test report sheets containing information on tests run on samples taken from these tanks. Specifically, these documents contain the results from tests run to determine the flash point of the diesel[1]. The lowest flash point *779 found for diesel in the bulk loading storage tanks during the month and a-half preceding the accident was 154°F, which was well above the standard set by the American Society for Testing Materials (see footnote 1). In contrast, the results of the tests run on samples taken from Blackmon’s storage tank and plaintiffs truck’s tank shortly after the accident, showed the flash points of the fuel therein to have been 90°F and 86°F, respectively.
Dr. Gerald D. Whitehouse was accepted by the trial court as an expert in the field of mechanical engineering. He identified a piping diagram of the truck-loading facility at the CONOCO refinery as being one he had examined prior to trial. He then went on to explain the meaning of the symbols, etc., found on the diagram. Dr. White-house identified two different areas where diesel could become contaminated with gasoline, etc., between the bulk loading storage tanks and the outlets used to place the various fuels in tank trucks. One of these areas was referred to as the “additive slab”, where different additives could be blended with specific fuel before they were loaded into tank trucks. The other was a “prover” tank used to measure the accuracy of meters found on the loading dock.
Dr. Whitehouse acknowledged that the additive slab would not be activated in normal operations by someone using the loading dock to load diesel. The CONOCO loading facility is of the type known as a key stop operation, i.e., the facility could be operated twenty-four hours a day, with or without CONOCO personnel being present, by someone having the right set of keys to enter the facility and activate the various loading devices. In order to activate the additive slab, one needed special keys. However, the evidence shows that the distributor who picked up the diesel from CO-NOCO (which eventually was placed in Blackmon’s tank and was alleged to have been contaminated at the CONOCO refinery) did not have any keys which could be used to activate the additive slab. Dr. Whitehouse also acknowledged that the prover tank would not be used in the normal day-to-day loading activities of the CO-NOCO facility.
Robert Palmer was the Terminal Manager in charge of CONOCO’s loading facility. He explained in detail the nature of a key stop operation. He was unable to recall any complaints being received from CONO-CO’s customers regarding diesel fuel obtained from the facility that did not meet industry specifications (including the minimum flash point). Palmer also testified that a person needed a specific key before he could activate the additive slab, and that the distributor who obtained the diesel in question did not have such a key. Palmer also explained in detail the uses to which the prover tank was put. He stated that the prover tank was scheduled to be used once every quarter, but that it would be used more often if there was a problem with a particular meter. The prover tank had not been used during the two months preceding the date of the accident.
Shirley Smith testified that he was the owner of Smith Oil Company, which was affiliated with Distributor’s Oil Company. Together, they operated a bulk plant which sold diesel, gasoline, etc. Blackmon was one of their customers. Smith stated that diesel fuel was brought to the bulk plant in either a Distributor’s Oil Company truck or by common carrier. It was then transferred from these trucks to a storage tank located at the bulk plant. There were other storage tanks containing gasoline, motor oil, etc., located there. In turn, Smith used two bobtail trucks to deliver fuel to his customers. Each of these trucks contained five different compartments into which fuel could be loaded. Smith testified that he was bringing diesel and loading it into Blackmon’s tank on an almost daily basis. *780 He further testified that he did carry split loads in his trucks (some compartments would be filled with gasoline and some with diesel), and that he relied on a visual inspection of the compartments, or the sound of the pump on the truck, to make sure that the compartments were emptied of whatever fuel they contained. Finally, we note that there was testimony indicating that the tank at Blackmon’s was loaded through a hatch which was always unlocked, and that the tank was placed in an unfenced portion of Blackmon’s premises.
It is our opinion that, taken as a whole, the circumstantial evidence introduced by plaintiff failed to exclude other reasonable hypotheses regarding the point at which the diesel in question became contaminated with gasoline with a fair amount of certainty. Stated another way, plaintiff failed to prove that, more likely than not, the diesel in question was contaminated before it left the CONOCO refinery. The extensive testing done there, together with the protective devices employed, clearly supports such a finding.
OTHER ISSUES
Because of our decision herein, there is no need to reach a decision on the other issues raised by plaintiff.
DECREE
For the above and foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed against plaintiff-appellant.
AFFIRMED.

. Oliver explained that the flash point was the temperature at which a combustible mixture *779 formed in a container partially filled with fuel when a flame was applied to the container under the conditions of the test. He further explained that an organization known as the American Society for Testing Materials had been formed for the purpose of checking standards and test methods to be used for testing products such as diesel. The ASTM had set the minimum required flash point for diesel at 125°F.