Donna D. **LANAUX**, et al.

v.

**TNT BARGE REPAIRS, INC.**, et al.

Civ. A. No. 81–708.

United States District Court,
E.D. Louisiana.

Dec. 16, 1982.

Robert T. Hughes, New Orleans, La., for plaintiffs.

Stephen N. Elliott, Metairie, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

This matter came before this court for a bench trial on October 5, 1982. At the conclusion of the evidence, the matter was taken under consideration. Plaintiff and defendant have now submitted proposed findings of fact and conclusions of law, and post-trial memoranda. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. On May 2, 1980, Tyrone Lanaux was employed by TNT Barge Repairs, Inc., a barge cleaning and repair service. While at work on a barge that day, Tyrone Lanaux attempted to start a gasoline engine driven water pump by pulling its starter rope. The rope broke, Tyrone Lanaux apparently lost his balance, fell overboard and drowned. His brother, Michael Lanaux, and his employer, Melvin Ray Tarver, witnessed the event. Michael Lanaux testified that when his brother fell overboard, he appeared to have in his hand the wooden handle and six to eight inches of the starter rope.

2. Tyrone Lanaux's widow instituted this action for wrongful death, seeking to invoke remedies under the Jones Act and general maritime law. Named as defendants were the decedent's employer, the barge owner, the manufacturer of the pump, the manufacturer of the pump engine, and the distributor of the pump. Shortly before trial commenced, plaintiff settled with all defendants except Briggs and Stratton Corporation, the manufacturer of the pump engine.

3. The pump (and its attached engine) was purchased by decedent's employer on

October 6, 1979, from Mayer-Hammant Equipment, Inc. It was stipulated by all parties that the pump, Model Number 62½ A 23 FF Serial Number 702251 and manufactured by Gorman-Rupp Co., was equipped with a gasoline engine, including a recoil starter mechanism, manufactured by defendant Briggs and Stratton Corp., type 0325–01, Model Number 233432, Serial Number 7808221.

4. The Briggs and Stratton engine was manufactured by defendant on or about August 21, 1978.

5. It was also stipulated by all parties that the engine was delivered by defendant Briggs and Stratton to Gorman-Rupp Co. with the recoil starter mechanism fully installed on the engine and with the rope fully installed by defendant in the recoil starter mechanism.

6. Tarver and Michael Lanaux were apparently unaware of any repairs or alterations to the pump or any of its component parts prior to the accident.

7. Shortly after the accident, the starter recoil mechanism—including the broken rope—was removed from the engine by Tarver or one of his employees, and taken by the employee to Ascension Lawnmower for installation of a new rope. The next day, the employee delivered the recoil mechanism back to Tarver with a new rope installed. Tarver also received a broken rope which he testified had been removed by Ascension from the starter recoil mechanism. Tarver placed the broken rope in an envelope and at some point turned it over to his attorney, Mr. Duffy. The recoil mechanism was affixed to the pump, and the pump put back into service.

8. Several days later, a claims adjuster from Aetna Life & Casualty Co., William Pender, called on TNT Barge Repairs to inspect the pump involved in the accident. At that time, Pender made note of the serial number of the pump.

9. Some weeks later, the pump was sent to Mayer-Hammant for a major overhaul, including replacement of the Briggs & Stratton engine. After this was done, the pump was returned to TNT Barge Repairs. It is unclear what happened to the old engine. According to the testimony of Aetna employee Gail Murphy, Tarver's son retrieved (from Mayer-Hammant) the discarded starter recoil mechanism and engine housing and brought them to Duffy. Neither Duffy nor Tarver's son was called to testify.

10. On November 7, 1980, Gail Murphy picked up from Duffy a broken rope in an envelope, a housing bearing a serial number that matched that noted by Pender, and a starter mechanism with an unbroken rope installed in it. Murphy delivered this equipment to plaintiff's retained expert, Courtney Busch, for his examination and report.

11. Busch examined the equipment he received from Murphy and made the following findings. The rope installed in the starter mechanism was 57½ inches long and had a diameter of .176.″ This rope was wound over a lug in a metal pulley. The rope was partially cut and frayed 26½″ from the handle end, and the fibers near the knotted end were "squashed." The broken, unattached rope was 38¼″ in length and .176″ in diameter and was lighter in color than the rope wound around the pulley of the recoil starter mechanism. This rope was frayed and cut partially through its diameter 1½″ from the knotted end, unlike the other rope. The unknotted end of the rope was broken. Busch concluded that the broken rope was probably shorter than the rope in the recoil starter mechanism.

12. Busch did not testify that either the ropes, the recoil starter mechanism, or the engine housing contained any defect in design or composition. Busch did testify that he believed that the rope installed in the starter mechanism had been installed improperly in that it passed over a lug in the pulley, instead of under it. In his opinion, this could cause the last wrap of the rope to rub against the engine housing and to come off the pulley and jam between the pulley and housing at a point approximately six inches from the handle end of the rope.

13. Although he did not see the broken rope actually installed, Busch further testified that he believed, from the condition of that rope, that it had been installed in the same, improper manner. He testified that although this would not cause the outer wrap of the shorter rope to rub against the housing or come off the pulley, it could cause the rope to become completely unwound from the pulley when the rope was pulled to start the engine. This, he believed, could cause the knotted end of the rope to rub against the edge of the pulley, fraying and cutting the side of the rope and exposing the rope to excessive loads. Busch was unable to testify as to what caused the rope to fail where it apparently did, i.e., 38¼″ from the pulling end, as compared to the failure of the rope involved in the accident some six to eight inches from the pulling end.

14. Defendant's expert, Robert Couchman, is an engineer employed by defendant for some 25 years. He testified generally that the recoil mechanism and the ropes Busch examined could not have been original equipment on the engine involved in the accident. He testified specifically that the tolerance diameter of the rope installed in the recoil mechanism was outside that of the ropes used by defendant; and the knot on that rope was not typical of defendant's ropes. Couchman also testified that the lighter, broken rope is of a type that would only have been used with a metal pulley. The engine in question was manufactured on or about August 21, 1978. Defendant discontinued using metal pulleys such as the one inspected by Busch in 1975. Since that time, defendant has been using acetal or plastic pulleys, which do not have lugs of any sort.

15. Couchman also testified that the recoil starter mechanism examined by Busch could not fit on the housing delivered to Busch absent an adaptor which must be riveted to the housing. Neither the housing nor the recoil mechanism, according to Couchman, evidenced any signs of ever having been riveted together.

16. Couchman further testified that engines destined for Gorman-Rupp pumps are painted red by defendant. The recoil mechanism delivered to Busch was painted orange over red.

17. Couchman's unimpaired testimony leads to the conclusion that the ropes and recoil mechanism examined by plaintiff's expert were not original equipment of the pump involved in the accident, but were apparently, unknown to decedent and others here involved, placed in use after the engine left the control of the defendant manufacturer.

*Conclusions of Law*

■ 1. The manufacturer of a product is liable to any person, who, without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the product, if the injury might have been reasonably anticipated. *Weber v. Fidelity & Casualty Insurance Co. of N.Y.,* 259 La. 599, 250 So.2d 754 (1971).

2. Liability is not imposed, however, unless the evidence preponderates that the injury was caused by a defect which made the product unreasonably dangerous and that the defect existed when the product left the hands of the manufacturer. *Madden v. Louisiana Power and Light Co.,* 334 So.2d 249 (La.App. 4th Cir.1976).

■ 3. Plaintiff does not contend and I do not find that defendant's product or any component part thereof was defective by reason of its design, manufacture or composition. Plaintiff sought to prove that the rope in use at the time of the accident was improperly installed in defendant's engine. Even if this were the case, plaintiff has failed to establish the requisite factual basis for demonstrating that the recoil mechanism and ropes examined by plaintiff's expert were original equipment on the defendant's engine at the time it left defendant's possession. To the contrary, the evidence predominates that any defect which caused an injury to the decedent did not exist when the product left the hands of the manufacturer, but came into being sometime thereafter.

4. Since plaintiff acknowledges that there was no defect in the design, manufacture or composition of defendant's product, she fails to carry her burden of proving that any defect for which defendant could be responsible caused the injury. Defendant offered uncontroverted proof that the recoil mechanism and ropes examined by plaintiff's expert were not original equipment on the pump involved in the accident. See Findings of Fact Nos. 14–17.

Accordingly, judgment is rendered in favor of defendant Briggs & Stratton Corporation and against plaintiff Donna Lanaux, each party to bear its own costs.

Defendant is instructed to prepare a judgment consistent with these findings.