Otis SCOTT, Plaintiff-Appellant,

v.

WHITE TRUCKS, Defendant-Appellee,

and

Great Atlantic & Pacific Tea Company, Intervenor-Appellant.

No. 79-3835.

United States Court of Appeals, Fifth Circuit.

March 7, 1983.

Rehearing Denied April 27, 1983.

---

S. Michael Cashio, Kenner, La., for plaintiff-appellant.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Claude D. Vasser, New Orleans, La., for Great Atlantic & Pacific.

Bernard, Cassisa, Babst & Saporito, Jerry L. Saporito, Metairie, La., for White Trucks.

Before BROWN, GEE and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

In this Louisiana law diversity suit, plaintiff Scott appeals from a judgment n.o.v. rendered in favor of appellee White Trucks dismissing Scott's products liability claim.[1] The primary questions are whether there is sufficient evidence to show that the product was defectively designed or manufactured, and if so, whether the defect existed when it left the manufacturer's hands. We hold there is no sufficient evidence to support

---

1. All parties assume here, as they did at trial, that Louisiana substantive law is controlling, and accordingly we, too, proceed on that basis.

the jury's findings and affirm the district court's judgment.

## I.

White Truck No. 1872, a three-axle tractor, was manufactured for appellee White Trucks by the Freightliner Corporation ("Freightliner") in October 1975. Following initial promulgation of federal regulations[2] requiring such devices, Freightliner equipped its White Freightliner models of the 1800 series with an automatic electronic anti-lock system designed to minimize air brake lockup problems and to enhance vehicle stability and control. Air brakes were placed on the steering axle, as well as the rear axles, of these trucks. Each axle was equipped with a separate anti-lock system. The system was manufactured by Wagner-Electric Corporation.

On October 31, 1975, Truck No. 1872 was sold by White Trucks to Hunsaker Truck Lines ("Hunsaker"). In October 1976, this truck and seven other White trucks of the same model and series, were sold by Hunsaker to Leaseway of Louisiana, Inc. ("Leaseway"), who leased them to Great Atlantic & Pacific Tea Company ("A & P"). Under the lease agreement, Leaseway maintained and repaired the trucks.

Appellant Otis Scott was employed as a truck driver for A & P. On August 17, 1977, about 5:30 a.m. on a wet and rainy dawn near Pascagoula, Mississippi, Scott was driving Truck No. 1872, which was pulling a trailer equipped with a similar braking system, back to New Orleans from Mobile, Alabama. Traffic was heavy, and a car changed lanes in front of Scott. Scott "lightly applied" the brakes, the left front wheel grabbed, the truck swerved to the left, and, as Scott testified, it ran "into the median and mud," he "lost control" and thereupon "it jackknifed." Scott received injuries in the accident.

Scott sued White Trucks and Leaseway, alleging that the truck's braking system was defectively designed or manufactured.[3] The liability issues were tried separately and before the damages issues. After Scott rested, White Trucks moved for a directed verdict, arguing that Scott had produced no evidence of a defect in design or manufacture. The district court denied this motion without prejudice. At the close of all the evidence, White Trucks reurged its motion for a directed verdict, but the district court reserved a ruling on the motion and sent the case to the jury, who found that the braking system in the truck was defectively designed or manufactured, and that the defect was a cause of Scott's accident. The district court then granted White Trucks' motion for directed verdict and rendered a judgment n.o.v. in its favor. The court held that there was no evidence of a defect in the design or manufacture of the truck, and that because of the long delay between the sale of the truck to Hunsaker and the accident, Scott had the burden of proving more than just the fact that the accident was caused by the brakes "grabbing."

## II.

Under Louisiana law, an individual "who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of" a product rendering it "unreasonably dangerous to normal use," may recover his damages from the maker of the product and "need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them." *Weber v. Fidelity & Casualty Insurance Co. of N.Y.*, 250 So.2d 754, 755–56 (La.1971). The plaintiff, however, not only "has the burden of proving that the product was defective" but also that his "injuries were caused by reason of the defect." *Id.* at 755.

---

**2.** 49 C.F.R. 571.121 (1976).

**3.** A & P intervened in the suit to recover worker's compensation benefits paid to Scott pursuant to the Louisiana Workmen's Compensation Act. The district court granted a summary judgment in favor of Leaseway on Scott's claim against it, as to which no complaint is made on appeal.

·Moreover, recovery is allowed against the manufacturer only "if the injured person proves ... that the product was defective when it left the hands of the manufacturer," and "[w]hile the rule [of strict liability] is harsh, liability is not imposed unless the evidence preponderates ... that the [injury-causing] defect existed when the product left the hands of the manufacturer." *Madden v. Louisiana Power and Light Co.,* 334 So.2d 249, 253, 255 (La.App. 4th Cir.1976).[4]

Cases involving products manufactured, sold, and retained in sealed containers normally present little difficulty in terms of whether a defect existing at the time of injury was also present at the time of manufacture. *Weber.* Even in other circumstances, the abnormal malfunction of a product shortly after manufacture may, where there is an adequate "accounting" of the use between the manufacture and the accident and evidence tending to negate other causes, give rise to an inference of a defect existing at the time of manufacture. *See e.g., Hunt v. Ford Motor Co.,* 341 So.2d 614, 618 (La.App. 2d Cir.1977) ("considering the well-documented and supported evidence that the steering mechanism 'popped,' 'binded,' and 'hung up' from the time the car was purchased [new by the plaintiff], with no evidence of intervening causation by faulty repairs, other accidents, or the like, it is reasonable to conclude that an unreasonably dangerous defect related to steering existed from the time of manufacture"); *Ned v. Hertz Corp.,* 356 So.2d 1074 (La.App. 4th Cir.), *writ denied,* 359 So.2d 197 (La.1978) (brake repairs performed March 5, vehicle returned to service March 6, accident occurred March 11 when brakes grabbed, as they had earlier that day and on other occasions since repair; these circumstances allow an inference that the brakes were defective on completion of March 5 repairs).

However, the manufacturer is under no duty "to make a product that will last forever or will withstand abuse or lack of maintenance" or that is "foolproof," *Tri-State Insurance Company v. Fidelity & Casualty Insurance Company,* 364 So.2d 657, 660 (La.App. 2d Cir.), *writ denied,* 365 So.2d 248 (La.1978); *Foster v. Marshall,* 341 So.2d 1354 (La.App. 2d Cir.), *writ ref'd,* 343 So.2d 1067, 1077 (La.1977), nor one whose component "parts do not wear out." *Insurance Company of North America v. Atlas Construction Company,* 368 So.2d 1247, 1249 (La.App. 4th Cir.1979); *Foster v. Marshall, supra.* And, where a particular defect or dangerous condition is not directly shown to exist at the time of manufacture, and the

---

**4.** This requirement, expressly stated in *Madden,* would seem to be implicit in *Weber's* reference to defects "in the design, composition, or manufacture." Defects brought about subsequent to manufacture are not defects *in* the design or manufacture. In this context, "composition" would also appear to refer to composition at completion of manufacture. Likewise, *Weber's* above-quoted rationale that "the manufacturer is presumed to know of the vices in the things he makes," is inapplicable to defects brought about after the product leaves the manufacturer's hands.

With respect to what constitutes a "defect," the cases of *Chappuis v. Sears Roebuck & Co.,* 358 So.2d 926 (La.1978), *Marquez v. City Stores Co.,* 371 So.2d 810 (La.1979), and *Hunt v. City Stores Co.,* 387 So.2d 585 (La.1980), represent, perhaps, something of a further development in Louisiana products liability law. *Hunt* and *Marquez* each involved the feet of small children in tennis shoes caught in department store escalators built to industry standards. *Marquez* held the store, but not the party manufacturing, installing, and maintaining the escalator, liable; *Hunt* held both liable. As we read *Hunt* and *Chappuis,* the manufacturer or seller may be liable if the product, as manufactured or sold, is unreasonably dangerous in normal use, even though neither the design nor the manufacturing process could reasonably be improved. The manufacturer's or seller's liability in such a case, however, is based entirely on failure to warn. *Hunt,* 387 So.2d at 589 ("Here, the risk of harm was known to Otis but not obvious to the public. ... Despite knowledge of the danger presented to children in tennis shoes, Otis had not warned of that hazard."); *Chappuis,* 358 So.2d at 930 ("But when the danger is known to the manufacturer and cannot justifiably be expected to be within the knowledge of users generally, the manufacturer must take reasonable steps to warn the user."). Further, nothing in *Chappuis, Marquez,* or *Hunt* suggests that the plaintiff is relieved of his burden of proving that the unreasonably dangerous characteristic of the product *both* caused the accident *and* existed at the time the product left the hands of the defendant manufacturer or seller.

product abnormally malfunctions, or even is directly shown to have a defective component, on the occasion of an accident occurring a significant time after manufacture, this will not alone authorize a finding that the product was defective while in the manufacturer's hands, if maintenance and employment by intervening owners and users is not adequately accounted for. *See Simon v. Ford Motor Company,* 282 So.2d 126, 128, 132–33 (La.1973)[5]; *Penton v. Budget Rent-A-Car,* 304 So.2d 410 (La.App. 1st Cir.1973)[6]; *Farmer v. Ford Motor Company,* 316 So.2d 140 (La.App. 2d Cir.1975).[7]

While language in the *Simon, Penton,* and *Farmer* opinions appears to indicate that in those cases the general theory of liability primarily being advanced

5. In *Simon,* the accident occurred in July 1968 when a ball joint in Ferrington's 1962 Ford came loose causing it to go out of control and into the wrong lane of traffic where it collided with plaintiff's vehicle. The collapsed ball joint was never examined. The car had been driven 76,000 miles, and Ferrington had purchased it used with 30,000 miles on it. As the opinion of the Court of Appeals reflects, an automotive expert testified that "ball joints, being sealed units, were intended to last the life of the vehicle," and this expert agreed with Ford's expert that the maintenance and lubrication procedure which Ferrington testified he followed, "was reasonable and proper" (*Simon v. Ford Motor Co.,* 256 So.2d 725, 728–29 (La.App.1972)), although, as the Louisiana Supreme Court observed, it was not the preferred method. 282 So.2d 126 at 133–35. The Louisiana Supreme Court held Ferrington liable because, though he was not shown to have been negligent, he "has not borne his heavy burden of exculpating himself from the slightest fault contributing to the accident" which occurred when his vehicle left its proper lane of traffic. *Id.* at 133. However, recovery was denied against Ford, as well as against McIlwain Motor Company, the dealer from whom Ferrington had purchased the car. Justice Dixon's original majority opinion states in this regard: "Because the record is void of any proof of the cause of the failure in the ball joint assembly, plaintiff Simon cannot prevail against Ford . . . [or] McIlwain . . . ." *Id.* at 128. Justice Tate, now of this Court, who dissented from other aspects of that opinion, concurred in this portion of it. *Id.* at 129 n. 1. The majority opinion on rehearing by Justice Tate again held for Ford and McIlwain, stating ". . . Ford had manufactured the automobile in 1962 and the ball joint assembly did not collapse until 1968, during which interval lack of lubrication or other owner misuse were more likely causes of the failure of the ball joint than any initial defect. We adhere to our initial determination that fault on the part of Ford is not proved . . . ." *Id.* at 133.

6. In *Penton,* plaintiff was injured in a November 1967 accident due to the badly deteriorated condition of the right front wheel brake assembly in the 1967 Mercury, then driven a total of 9,000 miles, which he had rented earlier the same day from Budget Rent-A-Car, which had purchased it new from Robinson, the Ford dealer. Under normal driving conditions the brake assembly should have lasted 25,000–30,000 miles, and its deteriorated condition at 9,000 miles was due to overly tight adjustment. The adjustment could have been done either manually or by the car's automatic brake adjusting system. Plaintiff's expert testified that if the adjustment were done automatically it had to be due to faulty factory installation of the car's automatic brake adjusting device. The evidence showed that neither Robinson nor Budget had adjusted the brakes. In holding there was insufficient evidence on which to sustain a finding against Ford, the appellate court stated: "But Budget rented the Mercury to various persons whose identities are not revealed; and the Mercury was used by the employees of Budget. . . . The plaintiff made no attempt to show freedom from fault on the part of any parties who had actual temporary possession of the vehicle, except Robinson and Budget." 304 So.2d 410 at 419.

7. In *Farmer,* the plaintiff, driving his Ford automobile about 50–55 miles an hour, heard a "pop," then saw something apparently fly off his car to the right, lost braking ability and then control of his car, which ran in a ditch. To the rear of his car its right rear wheel was found; the car's axle was broken, and apparently had a dark and a light crack. Ford's expert testified the axle was not defective, and theorized that it broke because of the impact of the car running into the ditch; no explanation, however, was given to account for the "pop" and loss of braking power and control. The car had been sold new by Ford in September 1970, and was purchased used by Farmer with approximately 12,000 miles on it in March 1972. The accident occurred in July 1972, when the car had been driven in total some 18,000 miles. The appellate court held that *res ipsa loquitur* was not available against Ford because "Ford had not been in possession of the automobile involved in the wreck for almost two years," 316 So.2d 140 at 141, and concluded that it could not be inferred "that there was a defect in the axle *that existed at the time of the original sale* by Ford" because "[t]he type of treatment the automobile received when it was owned by the former owners is not known." *Id.* at 143.

was one of negligence, rather than strict liability, we do not attach significance to this for present purposes. Some two years before those decisions *Weber* had established the strict liability of manufacturers for injuries caused by defects in product design, composition, or manufacture. Moreover, the questions of whether the product was defective when it left the manufacturer's hands, and of whether such defect caused the injury, are common to both the strict liability and the negligence theories of recovery. The two theories of liability are distinguished not by any difference in those elements, but rather by the fact that in strict liability the plaintiff need not prove that the presence of the injury-causing defect when the product left the manufacturer's hands was due to "any particular negligence by the maker." *Weber,* 250 So.2d at 756.

In determining the propriety of the judgment n.o.v. we utilize the standard set forth in *Boeing Company v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969):

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict...."

However, in this diversity case the above standard is applied against Louisiana substantive law, including that concerning the burden of proof, *John Hancock Mutual Life Insurance Company v. Dutton,* 585 F.2d 1289, 1296 (5th Cir.1978), the constituent elements necessary to support a *res ipsa loquitur* inference, *Kicklighter v. Nails By Jannee, Inc.,* 616 F.2d 734, 739 (5th Cir. 1980); *Waterburg v. Byron Jackson, Inc.,* 576 F.2d 1095, 1099, 1100 (5th Cir.1978); *Simmons v. City Stores Company,* 412 F.2d 897, 898 (5th Cir.1969); *Louisiana & Arkansas Ry. Co. v. Fireman's Fund Ins. Co.,* 380 F.2d 541, 543 (5th Cir.1967), and the effect of presumptions respecting facts constituting an element of the claim. Fed.R.Evid. 302.

### III.

There was no testimony as to any examination of Truck No. 1872's brakes following the accident, and the post-accident repairs apparently did not include any maintenance, repair, or replacement of the computer brake system or any other brake work. On July 28, 1977, some three weeks before the accident, Hessler, a Leaseway mechanic, performed a scheduled routine inspection and maintenance on the truck, which included checking the wiring of the brake system. He did not examine the inside of the "box" controlling the automatic brake system. He adjusted the brakes, which was "routine." He did not check the wheels or the brake lining. Apparently he did not perform a road test, stating that though this was sometimes done, "it's not standard." Pullen, Hessler's foreman, testified that Hessler had no computer brake training. Hessler, however, stated that he had "a little bit" of such training from another Leaseway mechanic, who showed him how to "adjust" the brakes but nothing about the computer "box."

No evidence was offered as to any defective component of this truck's braking system, nor as to any flaw in the system's

design. The only evidence as to what caused the grabbing of the brakes on this occasion was the testimony of plaintiff's expert witness Doyle, who stated that in his opinion this resulted from the failure of the electronic anti-lock system to release the brake air pressure with sufficient promptness.[8] There are several difficulties with Doyle's testimony, however.

Doyle identified no defect in the manufacture, composition, or design of the brakes or the anti-lock system, and did not suggest how or for what reason the supposed failure of the anti-lock system to timely reduce the air pressure came about. He did not even see this truck until August 1979, and there is no suggestion in the record that he ever examined either its brakes or anti-lock system, or the brakes or anti-lock system of any other truck of the same model. Further, Doyle's testimony in this regard was given entirely in response to a hypothetical question which assumed that when the wheel grabbed this caused "a jackknife effect" "which landed Mr. Scott in the neutral ground." On cross-examination, Doyle made it clear that he had simply "answered a hypothetical question" in which he had been asked to assume that Scott "made a . . . light brake application; the left front wheel locked, and it caused him to go into a jackknife." However, the undisputed evidence is that on the occasion in question the truck jackknifed *after* it hit "neutral ground," and *not* before.[9] This is significant because Hutton, the Freightliner Manager of Product Integrity, testified it was standard to allow a .55-second interval after braking action commenced and before the electronic anti-lock device commenced to release the air pressure on the brakes.[10] While Doyle would not agree to the .55-second figure, he did not dispute the presence of some such interval or its reasonable-

8. Scott also argues that a malfunction is evidenced by the fact that when Long, the wrecker driver, arrived a half hour after the accident he found the truck's wheels locked, and the engine off. This argument is without merit. Plaintiff's own expert witness, Doyle, testified at length that this was irrelevant because when the engine was off, the air pressure in the brakes would fall, and when it fell below a certain level, the "fail-safe" system to give mechanical braking function on loss of air pressure would automatically take over, and for that system to be released the engine would have to be started to build up the air pressure to the level where the "fail-safe" system would automatically release. Long, also a witness called by plaintiff, corroborated Doyle's testimony in this respect, and there is none to the contrary.

9. Plaintiff Scott stated that the brakes grabbed "which caused it to go into the median, and mud and everything, which I lost control and it jackknifed." He never testified that the truck jackknifed before going into the median. Plaintiff's witness Johnson, who observed the accident, testified: ". . . when it hit the neutral ground, it just folded up"; ". . . the truck went to the neutral ground, and it looked like it went over to the neutral ground. When it went to the neutral ground, that's when it folded up," and

"Q When you say folded up, you mean jackknife, or the truck—
"A I don't know what you call it; just folded around.
"Q After it hit the neutral ground?

"A Yes. After, it look like it folded up." When asked whether there was a curb in the neutral ground, Johnson replied, "A what? Yes, they have a hump in the neutral ground." The only other evidence concerning the occurrence was the testimony of Long, the wrecker driver who picked up the truck about a half hour after the accident and testified he found it upright on its wheels, with the trailer properly attached, "in the center of the neutral ground headed westbound, pointing towards the eastbound lane . . . in a jackknife position." Long had to "winch the truck over out of the edge of the ditch," which evidently ran along the edge of the neutral ground adjacent to the westbound lane (the truck was headed westbound, the accident took place some six or seven miles east of Pascagoula, and Long's place of business, which he came from and to which he took the truck, was in Pascagoula). The only damage which Long noted to the truck was to its front end where "it looked like the bumper or something jacked where it hit it." Subsequent inspection of the truck at the garage where Long took it revealed that "the cab was about four inches off the chassis."

10. Scott testified he was traveling 35 to 40 miles an hour, and hence would cover some 28 to 32 feet in this time interval. Neither testimony by Scott, nor skid marks, nor any other evidence indicates how long, other than very briefly, the brakes were locked.

ness, but rather was of the view that if the lockup was so severe as to produce a jackknife, then it was too long and evidenced a malfunction in the system.[11] It is plain from Hutton's testimony, undisputed in this regard, that a jackknife could easily have occurred on account of the truck, or its left front wheel, going into the "neutral ground" or median. Accordingly, Doyle's opinion that the electronic anti-lock device malfunctioned, being based on the incorrect assumption that the truck jackknifed *before* it made contact with the median (and hence that the lockup was sufficiently severe to produce a jackknife by itself), affords at best questionable support for plaintiff's case.[12]

However, even if it be assumed that there is sufficient evidence to establish that the anti-lock system malfunctioned, and was hence in some way defective on the occasion in question, there is nonetheless insufficient evidence that the system was defective when it left White Trucks' hands.

When the accident occurred in August 1977, the truck had been in use for nearly two years. The evidence does not show the mileage at this time, but an A & P Trip Report of February 8, 1977 shows the truck had then been driven 142,016 miles. Leaseway and A & P had owned and used the truck since October 1976, and Leaseway records did not indicate any repairs to the computer brake system between that time and the occurrence of the accident. The Leaseway maintenance system called for routine maintenance and repair, including brake adjustments and checking of the brake air hoses and electrical lines, every 9,000 miles; every 40,000 miles a more thorough checking of the brakes was performed, including matters not performed on the 9,000-mile inspections such as wheel removal and brake liner and bearing inspection. None of these involved maintenance or repair of the computer "box." Pullen, who started to work for Leaseway as a mechanic in January 1977 and became shop foreman there some time after August of that year, testified that while he never looked at the brake system on Truck No. 1872 "carefully," within a month or two after he arrived he had looked at the truck, though not "thoroughly," and did not see "any changes or alteration to the braking system." When the truck was received by Leaseway from Hunsaker in October 1976, it was approximately one year old and had been driven 128,559 miles. There is no evidence concerning either the age or mileage of the seven other model 1800 trucks which Leaseway acquired at the same time from Hunsaker. There is no evidence as to the use of any of these eight trucks by Hunsaker, nor were any Hunsaker maintenance or repair or other records respecting any of these trucks put in evidence or testified about. There is no indication whether any of these eight trucks were inspected when received by Leaseway, or, if so, the results of any such inspection. The earliest Leaseway record concerning Truck No. 1872 (no records concerning any of the other trucks were in evidence) is an A & P "Trip Report" (these forms also functioned as repair orders to Leaseway) of October 27, 1976, noting "Air pressure leak [*sic*] down while truck is run-

---

11. On cross-examination, Doyle stated, "... I'll agree that when we talk about controlled lockup, that for a short period of time it can lock up, but that's controlled, but you cannot have a controlled lockup when you go into a jackknife. So you have an uncontrolled lockup; that's all we're talking about. I'll agree to what you're saying [as to an interval after braking action commences and before release], but it's a controlled lockup." Doyle then proceeded to again testify "that if a truck jackknifes" then there had to have been a malfunction in the anti-lock system.

12. We also observe that both Doyle and Hutton testified, without contradiction, that the brakes were so constructed that pressure on the brake pedal applied air pressure equally to each wheel, and that the anti-lock system on a given axle, as it operated off a single valve opening through which the air pressure on both wheels of the axle would be released, would have to release the pressure equally on both wheels or on neither, unless there were defects in the air lines. Doyle never explained how a failure in the anti-lock system, apart from a defect in the air lines, could possibly cause only one wheel to lock up, or cause the truck to pull to the left.

ning & low air light come [sic] on. I can't find the leak." [13]

Hutton testified that the anti-lock system was tested thoroughly, including extensive road tests, by Freightliner and the government, and that it performed satisfactorily. He also testified that the brakes and anti-lock system on this particular truck were tested axle by axle before sale to Hunsaker and were in good working order.

Scott points to testimony by Hutton that the "computer box" and some other parts of the anti-lock system were to be maintenance-free by the consumer. However, Hutton further testified that other parts of the anti-lock system required maintenance, including "air lines subject to chaffing; ice buildup; ... electrical connections subject to water corrosion, and other things ...." There would certainly be maintenance required in the whole system." [14] Similarly, Pullen testified that he had seen instances, at least some before November 1977, where the brakes would be applied on 1800 models and "they don't come off, the brakes remain on." These instances were remedied by replacing the air release valve, Pullen explaining, "You get water in the tanks and they stick on you sometimes and you have to replace them." Accordingly, it is evident that there were several possible causes for the supposed failure of the anti-lock system to function other than a defect in the "computer box."

As to the "computer box" itself, Hutton testified that the trucks were equipped with a warning light in the cab to indicate a malfunction in the electronic computer for the anti-lock system, and if the light came on the consumer should take the truck "to an authorized garage for repair." [15] Pullen testified that when complaints of computer brakes were made the Leaseway mechanics road tested the trucks, but did not take them to "the White office here." Hessler stated, "We usually change the whole box if it's bad" and recalled "at least one" unspecified instance when this was done. Pullen's testimony reflects that before November 1977 Leaseway had no computer-brake trained mechanics. The testimony also shows that there were no manuals or the like made available to the Leaseway mechanics respecting maintenance or repair of the automatic anti-lock system, and there is no evidence to establish that this lack was attributable to White Trucks or Freightliner. Finally, in regard to the care and maintenance of the "computer boxes" we must consider the testimony of plaintiff's witnesses Blade and Green.

Blade, an A & P truck driver from some time in 1976 until October 1977, testified that he experienced "grabbing or pulling of the brakes upon application" when driving White Freightliner model 1800 trucks, and that he drove Truck No. 1872 some seven or eight times in 1977, and on application of the brakes "it would have a tendency to pull either to the right or to the left." When this occurred, he would "write it up and turn it in" to Leaseway for them to fix. Sometimes they fixed it, and sometimes they didn't. He did not know what was causing the brake problem or what part of the brakes malfunctioned. The wheels that

13. An A & P Trip Report of March 28, 1977 on Truck No. 1872 notes, "Truck pull to left when applying brakes," and a June 15, 1977 Trip Report on the same vehicle states, "Pull to left." There is no evidence of what caused these reported conditions or what corrective action, if any, was taken in response thereto. Since the anti-lock system would not operate to free one wheel on an axle and not the other, unless an air release line were not functioning or the like, the characteristic of pulling to the left does not necessarily bespeak a failure in the anti-lock system.

14. This was in addition to the "normal foundation brakes that are there, regardless of wheth-

er you have a computer system or not, the brake drums, everything else ... that's all subject to wear and tear and maintenance." These items were, in effect, part of the computer brake system because "[t]he computer controls part of the brake system, and if anything malfunctions in the brake system, you have a problem."

15. He also observed that "if the truck battery was having low voltage" this could cause the computer to "act erratically." There was no evidence whether or not this would bring on the warning light.

would lock up were the wheels on the rearmost axle. While he apparently never experienced a jackknife, on one occasion in May 1977, Truck No. 1872's rear wheels locked up so he could not move the truck. A Leaseway mechanic came out and "beat on" the computer box and after "he hit on there a little while" the brakes released, and "then he adjusted them."

Green's testimony reflects that this method of servicing the computer box was not unique. Green was a Leaseway truck mechanic until June 1977, and before coming with Leaseway worked some nine years in the same capacity for Hunsaker. He worked on the same 1800 model trucks at Hunsaker as he did later at Leaseway. It is impossible to determine whether his testimony about the trucks relates to the time he was with Leaseway or with Hunsaker or both. In any event, Green testified on direct examination by Scott's attorney as follows:

"Q Did you ever work on any White Freightliner of the 1800 series that had any lockup problems?

"A Yes, I have.

"Q Could you tell the Jury how that came about, what repair work you did on it?

"A Well, the Freightliner, we would get them running, and we would set them up in the yard and start them up and get them ready for the guys to go, and let them set there running, and they would lock up, there, sitting out in the yard.

"Q Is that normal?

"A To my idea, no. I don't think no brakes just lock up just setting up in the yard.[16]

"Q How did you fix that when they were locked up?

"A Well, I didn't know too much about it. They had the little black box on there, like.

"Q Was that *the computer box?*

"A *Right,* and that was the only thing that would cause this trouble, because *I would take the top off and bang around on the wires* and tap the box, and a little while the truck would be ready to go.

"Q The brakes would release?

"A The brakes would release.

"Q Were you given any type of manuals to repair—to work with the computer box?

"A No, they never did give us nothing, no literature, no demonstration, no nothing like that.

"Q Did you take any kind of class on how to repair that?

"A No, they had nobody to teach us nothing about that." (Emphasis added.)

Green testified he worked on "practically all" the eight model 1800 trucks for "locking up".

Green's testimony, the substance of which we have outlined, is the only evidence even arguably relating to the truck in question, or the other model 1800 trucks, while they were with Hunsaker. Yet, as noted, it is impossible to tell whether Green was speaking of the time he was with Leaseway or with Hunsaker or both. Even if he were addressing the time he was with Hunsaker,

---

**16.** This is to be contrasted to the testimony of plaintiff's expert Doyle that "any air brake truck will have a certain amount of leaks when it's sitting up for a period of time, that they have to crank the truck up and build the air up to release the brakes before they go on a run." Accordingly, the inference from the indicated portion of Green's quoted testimony is that *some character of air leak caused the pressure to fall and the fail-safe mechanical system to take over. See* note 8, *supra.*

Green also stated, in another part of his testimony:

"When you start running these things and you hit the brakes, sometimes it will stop, and sometimes they wouldn't. When you go across the yard and hit the brake, they just lock up and jerk your arm and almost break your arm, when it's right or left."

The failure to stop obviously bespeaks a problem other than that involved here. The pulling to the right or left would not necessarily indicate a failure of the anti-lock system, as it would release both wheels on an axle or neither, unless some other factor, such as a clogged air line, were involved.

his testimony clearly furnishes no reasonable basis for concluding that Hunsaker's use, maintenance, and repair were not such as would likely have caused a defect in the automatic anti-lock system or other aspects of the brakes.

Scott stresses the testimony that "practically all" these eight model 1800 trucks had "lockup" problems. There is no evidence, however, that this occurred soon after manufacture, but at most only at some time while owned by Hunsaker. There is nothing to indicate how many such trucks were manufactured by Freightliner, nor the age or mileage of any of these particular eight trucks other than Truck No. 1872, nor the character of use Truck No. 1872 or any of the others had with Hunsaker. We are informed, however, that truck mechanic Green, and those he worked with, had no literature, manuals, training and "no nothing" on this type of braking system, and "didn't know too much about it." We are also informed that Green took the top off the computer box and "bang[ed] around on the wires" on "practically all" of these eight trucks.

Scott also argues that, even aside from claimed defects in the anti-lock system, the brakes on Truck No. 1872 were defective because they were "too strong." Parts of Doyle's testimony can be read as suggesting that front axle brakes could be dangerous without a properly functioning automatic anti-lock system. However, in the absence of proof that the anti-lock system was defective when manufactured, this does not advance Scott's case. Aside from being on the front axle, there is no evidence that the brakes were too strong when manufactured.

■ We conclude that plaintiff Scott has not carried the burden of proof which Louisiana law places on him to show that either the automatic anti-lock system in particular, or the brakes in general, on Truck No. 1872 were of a defective design, or contained a defect in manufacture or composition, when it left the hands of White Trucks in October 1975, and that he has not made the showing required by Louisiana law to authorize a *res ipsa loquitur* type inference against White Trucks. While there may be a scintilla of evidence supporting Scott, nevertheless, viewing the evidence as a whole, though in the light and with all reasonable inferences most favorable to Scott, in our opinion reasonable men could not conclude therefrom that it was more probable than not that the August 1977 accident resulted from a defect in Truck No. 1872's brakes or braking system which existed in October 1975 when it left White Trucks' hands. In our view, the evidence as a whole in this case, viewed in the light and with all reasonable inferences most favorable to Scott, clearly places it on the *Simon, Penton,* and *Farmer* side of the line which separates those cases from decisions such as *Hunt v. Ford Motor Co., supra,* and *Ned v. Hertz Corp., supra.*

■ Scott also argues that White Trucks is liable on a failure to warn theory. This argument fails for several reasons. To begin with, for recovery to be had on this basis Scott must first show that the truck was unreasonably dangerous as manufactured. We have held no such showing was made. We further observe that Scott's own testimony amply demonstrates that well before the accident he was aware of a propensity on the part of Truck No. 1872 to have its brakes "grab" or "lock," and to pull the truck to one side or the other. Louisiana law does not require a warning to those who are actually aware of the matter.[17] *Foster v. Marshall, supra,* 341 So.2d at 1362. See *Hebert v. Brazzel,* 403 So.2d 1242, 1245 (La.1981). See *also* the language from *Chappuis* at 930 and *Hunt* at 589, quoted in note 4, *supra.* Finally, the truck was equipped with a warning light to signal

---

17. We do not suggest that Scott's knowledge would defeat recovery if the accident were shown to have been caused by a defect in the braking system (whether of design, composition, or manufacture) existing when the truck left White Trucks' hands. Such knowledge merely defeats lack of warning as an *independent* ground of recovery in the absence of proof that the accident was caused by a defect (in design, manufacture, or composition) present or inherent in the product when it left the hands of the defendant manufacturer.

that the automatic anti-lock system was not properly operating. While Scott testified that the light did not come on on this occasion and he (and others) testified that these lights on the 1800 model trucks at Leaseway did not seem to work as they should, there is no evidence concerning the cause of any such failure or suggesting that it was attributable to a defect existing when this vehicle or any of the others left the hands of White Trucks, rather than to old or faulty bulbs, worn wiring or any other of a number of possible causes. There was no testimony whatever concerning any examination of any of these lights, or what sort of maintenance, replacement, or repair they were supposed to have or did in fact have.[18] We also note that Doyle's testimony does not criticize Freightliner or White Trucks on any failure to warn basis. Accordingly, we reject Scott's claim of recovery on a failure to warn theory.

Scott's final contention is that the district court erred in excluding a maintenance manual printed by Wagner-Electric Corporation for its anti-lock system. We hold that any error in excluding this document was harmless, for while it may have been relevant, its presence in the record would not have established the existence of a defect when the truck left the manufacturer's hands, nor would it have sufficed to make out a case under a failure to warn theory.

The district court's judgment is affirmed.

AFFIRMED.

18. Green's testimony, the only evidence arguably even touching on the "Hunsaker" period, does not even mention the light.